**The PANTRY, INC., Plaintiff,**

v.

**STOP–N–GO FOODS, INC., and Tri–State Stop–N–Go, Inc., Defendant.**

**No. IP 88–1345–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

June 29, 1992.

William C. Barnard, Frank J. DeVeau, Sommer & Barnard, Indianapolis, Ind., for plaintiff.

Robert F. Wagner, R. Robert Stommel, Lewis Bowman St. Clair & Wagner, Indianapolis, Ind., for defendant.

## ENTRY GRANTING PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

TINDER, District Judge.

The parties' cross-motions for summary judgment require the Court to reach a single conclusion of law: Does a property owner "dispose of waste" in violation of Kentucky Revised Statute § 224.40–100 if portions of its petroleum product inventory leak inadvertently from underground storage tanks into the surrounding soil? The Pantry argued that the statute is violated any time that solid waste is released and abandoned without a permit. Stop–N–Go countered that the statute prohibits intentional "dumping" only. After reviewing the parties' arguments and submissions, the Court determines that Stop–N–Go violated Section 224.40–100 as a matter of law and that The Pantry's Second Motion for Partial Summary Judgment should be granted.

## FINDINGS OF FACT

On December 18, 1987 Plaintiff The Pantry and Defendants Stop–N–Go Foods, Inc. and Tri–State Stop–N–Go, Inc. (collectively "Stop–N–Go"), executed an Asset Purchase Agreement ("Agreement") conveying sixteen convenience stores ("Stores") from The Pantry to Stop–N–Go. Five of the Stores located in Kentucky have facilities for the retail sale of gasoline.

Article 13 of the Purchase Agreement contains the entirety of the warranties, covenants, and other provisions that were agreed to by the parties concerning the environmental condition of the Properties. Article 13 contains the following definition of the term "Environmental Requirements," which is used throughout the article:

"Environmental Requirements" shall mean: federal, state, county or local statutes, laws, rules, regulations, ordinances, codes, licenses, permits or standards in effect as of the date of execution hereof imposed by any governmental authority having jurisdiction in the matter as of the date of execution hereof, relating to environmental matters, including, by way of illustration and not limitation, the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*) and the Comprehensive Environmental Response, Compensation and Liability Act, as amended (42 U.S.C. § 9601 *et seq.*).

Paragraphs C and D of Article 13 of the Purchase Agreement contain the following warranties of Stop–N–Go (referred to as the "Seller") to The Pantry (referred to as the "Buyer") concerning the Stores (referred to as the "Property"):

C. As of the date of closing, the real property including leased real property, which is the subject of this Agreement (the "Property"), and such Property's use at the time of closing and prior uses by Seller, and to Seller's knowledge any other person, to the best of Seller's knowledge substantially comply and have at all times substantially complied with, and Seller is not in violation of and has not violated, in connection with the ownership, use, maintenance or operation of the Property in the conduct of the business related thereto, Environmental Requirements. Except for the Property suffering the Known Contamination, no corrective action, work, repairs, construction, or other expenditures with respect to the Property is required by

Environmental Requirements. Except for the Property suffering the Known Contamination, no hazardous or toxic materials, substances, pollutants, contaminants, or waste have been, by Seller or to Seller's knowledge any other person, to the best of Seller's knowledge released into the environment or deposited, discharged, placed or disposed of at, on, or to Seller's knowledge near the Property at levels requiring any corrective action under Environmental Requirements as defined herein, and the Property has not been used at any time by Seller as a landfill or waste disposal site, and Seller has no knowledge that the Property has been used by any person as such.

D. No notices of any violation of Environmental Requirements relating to the property of its use have been received by Seller. There are no writs, injunctions, decrees, orders or judgments outstanding and no lawsuits, claims, proceedings, or investigations pending or threatened relating to the ownership, use, maintenance or operation of the property, with the exception of the Known Contamination.

With the exception of the Property suffering the Known Contamination, Purchaser accepts the locations, tanks, and dispensing equipment in their present condition and assumes responsibility therefor as of the date of closing hereof, and agrees to hold Seller harmless from any loss, cost, damage or expense arising from or related to the existence of or operation of such gasoline storage tanks and facilities, despite the fact that changes in the Environmental Requirements may occur subsequent to the date of execution hereof, and such changes in the future may dictate action not required at the time of execution hereof, with the exception that in the event that during a period of six (6) months after the closing, corrective action is required as the result of the existence of contamination or lack of tigtness [sic] in tanks or dispensing equipment prior to the closing and delivery of possession hereunder at levels requiring corrective action, pursuant to the Environmental Requirements. Seller shall indemnify and hold Purchaser harmless from any loss, cost, damage or expense, including reasonable attorneys' fees, resulting from and related directly to such necessity for corrective action. Such indemnity shall not relate to consequential or indirect expense or loss such as, by way of illustration and not limitation, interruption of business, loss or revenue or profit, or interference with ingress and egress to the Property, and in the event any action or proceeding is instituted to enforce any obligation hereunder relating to such indemnity, Purchaser shall have the burden of proof to establish that such corrective action is the result of contamination or such lack of tightness existing prior to the date of closing at levels requiring such corrective action pursuant to the Environmental Requirements in place as of the date of closing.

In anticipation of the sale, Stop–N–Go hired Losack, Inc., an environmental consulting firm, to perform tests on the facilities' underground storage tanks ("USTs") and obtain soil and/or groundwater samples from each of the stores where gasoline was sold. Losack conveyed its test results to Stop–N–Go on December 8, 1987. (Defs.' Resp. Pl.'s Reqs. Admis. ¶ 6.) These test results were completed on December 3 and 4, 1987. (*See Id.* ¶¶ 8, 10, 12, 14, 16.) The test results, which are undisputed in this matter, disclosed that there were varying degrees of contamination in the soil or ground water at each of the five Kentucky locations. The test results disclosed the following levels of the substances listed:[1]

---

**1.** MW# refers to monitoring well samples of groundwater; B# refers to boring samples of soil; S# refers to particular samples of ground-water or soil from a given monitoring well or soil boring.

a. 1704 2nd Street, Henderson, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B#1, S#1 | 0.82 | 24.14 | 1.26 | 229 |
| B#1, S#2 | <0.10 | 22.0 | 0.80 | 32 |
| B#1, S#3 | <0.10 | 2.68 | 1.87 | 74 |
| B#2, S#1 | <0.10 | 1.47 | 0.97 | 41 |
| B#3, S#1 | <0.10 | 0.87 | 0.85 | 100 |
| B#4, S#1 | 0.38 | 1.51 | 1.70 | 27 |

b. 1415 Bosley Road, Owensboro, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B#1, S#1 | 1.10 | 1.91 | 9.06 | 195 |
| B#2, S#1 | 0.40 | 1.52 | 10.10 | 79 |
| B#2, S#2 | <0.10 | <0.10 | 0.95 | <5 |
| B#3, S#1 | <0.10 | 1.80 | 6.17 | 105 |
| B#3, S#2 | <0.10 | <0.10 | 6.17 | 21 |
| B#3, S#3 | 0.40 | 0.70 | 1.83 | 25 |
| B#4, S#1 | <0.10 | 0.27 | 6.66 | 149 |
| B#4, S#2 | 0.70 | 1.65 | 17.90 | 84 |
| B#5, S#1 | <0.10 | 2.18 | 10.12 | 126 |
| B#5, S#2 | <0.10 | 1.16 | 5.31 | 163 |

c. 600 Breckenridge, Owensboro, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B#1, S#2 | 0.50 | 1.19 | 9.29 | 55 |
| B#2, S#1 | 4.00 | 12.22 | 35.62 | 645 |
| B#3, S#1 | 0.69 | <0.10 | <0.10 | 80 |
| B#4, S#1 | 5.95 | 3.32 | 8.56 | 89 |
| B#4, S#2 | 0.39 | 1.17 | 12.33 | 116 |

d. Route 1, Highway 54, Philpot, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B#1, S#1 | <0.10 | <0.10 | <0.10 | 28 |
| B#1, S#2 | 0.10 | 0.25 | 0.81 | Not available |
| B#2, S#1 | 0.26 | <0.10 | 2.25 | 23 |

e. 1209 South Green Street, Henderson, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B#1, S#1 | 0.18 | 0.23 | 0.18 | 108 |
| B#2, S#1 | <0.10 | 0.10 | 0.66 | 6 |
| B#3, S#1 | <0.10 | 0.20 | 0.93 | 10 |
| B#3, S#2 | 0.36 | 0.28 | 1.03 | 12 |
| B#4, S#1 | <0.10 | 0.13 | <0.10 | 82 |
| B#5, S#1 | .18 | 2.15 | 10.29 | 103 |
| B#5, S#2 | <0.10 | 0.24 | 0.57 | 8 |
| B#6, S#1 | 0.67 | 7.23 | 14.01 | 142 |
| B#6, S#2 | <0.10 | 0.66 | 2.03 | 25 |
| B#7, S#1 | 0.24 | 1.15 | 3.63 | 60 |
| B#8, S#1 | <0.10 | <0.10 | 3.77 | 27 |

Stop–N–Go did not have a permit to dispose of waste at any of its Kentucky Stores.

## DISCUSSION

██ Substances meeting the definition of "waste" have escaped from underground storage tanks during the time that Stop–N–Go owned the Kentucky Properties. The term "waste" is defined by Kentucky law to include both "solid waste" and "hazardous waste." Ky.Rev.Stat.Ann. § 224.01–010(31) (Michie/Bobbs–Merrill 1991). That section defines "waste" to include the following:

(a) "Solid waste" means any garbage, refuse, sludge, and other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining (excluding coal mining wastes, coal mining by-products, refuse and overburden), agricultural, operations, and from community activities....

Ky.Rev.Stat.Ann. § 224.01–010(31) (Michie/Bobbs–Merrill 1991). "Discarded material" is defined by the Kentucky administrative regulations as "any material which is ... 'Abandoned'" and further that "Materials are waste if 'abandoned' by being ... Disposed of...." 401 Ky.Admin.Regs. 31:010(2)(b) (1991). Thus, commercial petroleum products are "waste" if they are disposed of. Both parties seem to agree about this point. (*See* Pl.'s Br. Supp. 2nd Mot. Partial Summ. J. at 1–2; Defs.' Br. Supp. Defs.' Mot. Partial Summ. J. at 4.) Under the parties' Agreement, if this waste escaped in violation of Kentucky law, then Stop–N–Go breached the Environmental Warranties in the Agreement and will be liable for such breach.

The Pantry claims that Stop–N–Go violated a Kentucky environmental protection statute, which provides in pertinent part as follows:

No person shall transport to or dispose of waste at any site or facility other than a site or facility for which a permit for waste disposal has been issued by the cabinet.

Ky.Rev.Stat.Ann. § 224.40–100 (Michie/Bobbs–Merrill 1991).[2] The term "dispose" is defined by Kentucky law as follows:

"Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any waste into or on any land or water so that such waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

Ky.Rev.Stat.Ann. § 224.01–010(10) (Michie/Bobbs–Merrill 1991).[3]

At issue is the matter of law whether the *manner* in which the releases occurred is material to finding a violation of the statute. Obviously, if the statute is written to prohibit any release of solid waste—no matter the circumstances of the release—then Stop–N–Go has violated the statute. Alternatively, if the statute is written more narrowly to proscribe releases caused by certain types of conduct only, then the Court must consider the evidence presented regarding that required conduct.

There is no evidence in the record inferring that Stop–N–Go intended to release and abandon the petroleum product inventory that was in fact leaking from their USTs.[4] The Pantry's Motion for Partial Summary Judgment argued that, by itself, evidence of petroleum-based substances— "waste"—in the soil established that Stop–N–Go violated Section 224.40–100. The Pantry placed particular emphasis on Kentucky's definition of "disposal," which pro-

---

**2.** This statute and the other relevant statutes and regulations discussed in this Entry were in effect in their current form on December 18, 1987, the date the parties closed the Agreement. Kentucky's environmental statutes were renumbered on February 26, 1991. Prior to that date, this statute was located at Ky.Rev.Stat. § 224.-835.

**3.** This statute was formerly located at Ky.Rev. Stat.Ann. § 224.005(10).

**4.** Both parties argued as if the substances detected by the Losack tests were released through unknown failures in the USTs; thus, the Court will take as a fact for purposes of the cross-motions that the waste at issue was released in that manner.

vides that waste may be "disposed" by "spilling" or "leaking." The Pantry concluded that Stop–N–Go unlawfully disposed of waste in an unpermitted site when the petroleum leaked from the USTs; moreover, Stop–N–Go affirmatively "abandoned" the released waste by failing to clean it up after discovering the contamination via the Losack tests. In sum, The Pantry·relies on the plain language of the statutory definition of "disposal" and persuasive federal opinions regarding similarly-phrased federal environmental laws.

Stop–N–Go argued that one must act affirmatively to discard unwanted petroleum product for that waste to be "disposed" in violation of § 224.40–100. Stop–N–Go argued that it did not unlawfully "dispose of waste" when its properties harbored an unknown, undiscovered and therefore inadvertent release of petroleum inventory. Seemingly unsatisfied with the plain language of the statute, Stop–N–Go's argument immediately leapt to decisions regarding the identical definition of "disposal" in two federal environmental laws. Stop–N–Go offered little analysis of the Kentucky statute at issue, but instead argued as if the federal law provided binding interpretation of Kentucky law.

Although this Court would benefit from an authoritative interpretation of these provisions by Kentucky's highest court, no matter has yet presented this precise issue to that body. Based upon this Court's Entry regarding The Pantry's prior Motion for Partial Summary Judgment, the parties are well aware of the proper manner to *apply* statutory language. That is, language of a statute or contract is applied first and then "interpreted" *only* if there is more than one reasonable way to construe the language. Were § 224.40–100 the only relevant statute at issue, the Court would have to consider only whether the term "dispose" includes an inadvertent release. However, that term has been defined as a term of art by another Kentucky statute and thus its common meaning must give way to that specifically defined by statute. Section 224.01–010(10) provides that " 'Disposal' means the ... leaking ... of any waste into or on any land." The term

"leaking" is not defined further in any Kentucky statute or regulation.

 This is primarily an issue of so-called statutory construction. The bedrock principles providing the proper method for a Court to assess the meaning have been often and well stated. A court should apply a statute in the manner that gives effect to the intent of the legislative body in enacting the statute. *United States v. Roy*, 830 F.2d 628 (7th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988). The most reliable guide to the legislature's intent is the language of the statute itself; a court must begin by determining whether the language of a statute admits of a plain meaning. *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Mallard v. United States Dist. Ct. for S. Dist. Iowa*, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *Meredith v. Bowen*, 833 F.2d 650 (7th Cir.1987). Words in a statute are to be given their plain and ordinary meaning. *Jones v. Hanley Dawson Cadillac Co.*, 848 F.2d 803 (7th Cir.1988).

 If the intent is clear from the plain terms of the statute, then the court must give ordinary effect to those terms. *Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n*, — U.S. —, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991); *West Virginia Univ. Hosps., Inc. v. Casey*, — U.S. —, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). A statute's plain meaning can be disregarded only if the language is ambiguous or that reading would give the statute an absurd effect that is obviously contrary to the legislature's intent. *Demarest v. Manspeaker*, 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991); *United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave., Elgin, Ill.*, 903 F.2d 490 (7th Cir.1990), *cert. denied sub. nom. Born v. United States*, — U.S. —, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991); *Smith v. Bowen*, 815 F.2d 1152 (7th Cir.1987). However, a plain, unambiguous meaning cannot be disregarded, even if the court believes the result would be unreasonable.

*C.I.R. v. Asphalt Prods. Co., Inc.*, 482 U.S. 117, 107 S.Ct. 2275, 96 L.Ed.2d 97 (1987).

■ The language used in the Kentucky statutes at issue is not ambiguous and allows this Court to apply the terms as written. The terms admit of a plain and ordinary meaning, which is not contrary to the overall purpose of the Kentucky environmental protection scheme. "Leaking" does not commonly imply an intentional act. Rusted barrels, radiators, USTs each may "leak" without anyone's aid or knowledge; moreover, an unseen or unintended gravity-aided release from these containers would most naturally be called a "leak." Were one purposefully to refer solely to a controlled or intentional release of some substance, one would almost never use the term "leak" to capture that meaning. To a lesser degree the term "spilling" also captures an unintentional release, albeit generally over the brim of a container rather than through a fissure as in a leak. Therefore, the word "leaking," by itself, plainly includes and likely connotes an unintentional or inadvertent release.

■ At this point one might be quick to argue that it is possible or reasonable to interpret the term "leaking" to include an affirmative, intentional act *also*. That fact does not create any relevant "ambiguity"; there is nothing ambiguous about using a term that *could* mean a voluntary or involuntary releases when both types of releases are reasonably within the statutes' purpose. Stop–N–Go must establish that even though the plain meaning of the word "leaking" clearly contemplates an unintentional release, the statute's use of term *requires* an intentional act. That is, the statute must exclude the more natural meaning in favor of the less common meaning.[5] None of Stop–N–Go's arguments persuade the Court that the term "leaking" should have anything other than its common, ordinary meaning.

A number of factors counsel against Stop–N–Go's conclusion that the term "leaking" requires an intentional act. The most obvious reason is that Stop–N–Go's construction requires additional terms. Stop–N–Go implicitly argued that the term "leaking" must be read to mean *"intentional, knowing, or discovered leaking."* If Kentucky desired to target intentional releases only, then it easily could have included that concept somewhere in the definition of "disposal." The absence of these restrictive terms counsels that the term "leaking" was intended to include unintentional and intentional releases.

The language the Kentucky legislature actually did include in the definition of "disposal" indicates that waste may be disposed by an inadvertent release. Section 224.01–010(10) contains seven terms describing the manner of releases considered "disposals"; thus, in giving effect to each word in the statute, it appears that each word was intended to include a different kind of release within the definition. At least five of the terms describing the manner in which waste may be released imply an affirmative act; these terms are discharge, deposit, injection, dumping and placing. There can be no doubt that the definition of "disposal" includes intentional releases. It would appear that the terms "dumping" and "injection" are used to make plain that both surface and sub-surface releases are considered "disposals." The terms "leaking" and "spilling" would be entirely unnecessary if they were intended to include intentional releases only. Both terms, which plainly include inadvertent releases of waste, make clear that unintentional surface (spilling) and subsurface (leaking) releases constitute "disposals" also.

Both parties debated at length the merits of administrative and judicial opinions discussing CERCLA and RCRA provisions that are substantially similar to Kentucky's definition of "disposal." As a matter of law, these opinions are merely persuasive evidence regarding the proper application

---

**5.** Unlike a term in a contract, if a term in a regulatory statute allows more than one meaning, it does not render the term "ambiguous" and outside the province of law. Obviously, a statutory term may have multiple meanings as a matter of law; thus, there is no infirmity in this statute merely because the term "leaking" may refer to intentional *or* inadvertent releases.

of the Kentucky statute. No Kentucky court or federal court rendering binding precedent in this district has ruled on the Kentucky statute at issue. Thus, the opinions cited are relevant only to the extent that the Court finds their reasoning persuasive. To the extent that CERCLA, RCRA and the Kentucky statutes are relevantly analogous, and to the extent these opinions have addressed a relevant issue, the Court finds that the opinions support the conclusion that § .224.40–100 includes and proscribes inadvertent leaking of waste.

RCRA allows recovery of remediation costs against any person "who has contributed or is contributing to the past or present ... disposal of any solid or hazardous waste." 42 U.S.C. § 6972(a)(1)(B) (West Supp.1992). RCRA defines "disposal" as follows:

> **The term** "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any **solid waste or hazardous** waste into or on any land or water so that such **solid waste or hazardous** waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.A. § 6903(3) (West 1983) (emphasis added). The RCRA definition of "disposal" is identical to the Kentucky definition, excepting the portions that have been emphasized above. Similarly, the term "solid waste" has been defined in language substantially identical to that provided by Ky.Rev.Stat.Ann. § 224.01–010(31) and 401 Ky.Admin.Regs. 31:010(2)(b). 42 U.S.C.A. § 6903(27) (West 1983); 40 C.F.R. § 261.2 (1990). CERCLA's definition of "disposal" is identical to that provided by RCRA: CERCLA provides that the term "shall have the meaning provided in section 1004" of RCRA (42 U.S.C. § 6903(3)). 42 U.S.C.A. § 9601(29) (West Supp.1992).

Given this similarity, the parties attempted to guide the Court's interpretation of Kentucky law by referring to federal decisions concerning the RCRA and CERCLA

definitions of "disposal." The Fourth Circuit issued a decision squarely addressing this issue on May 29, 1992.[6] *Nurad, Inc. v. William E. Hooper & Sons, Co.*, 966 F.2d 837 (4th Cir.1992). In *Nurad,* a current owner of a site attempted to recover from previous owners and tenants for remediation costs the current owner incurred to remove leaking USTs containing mineral spirits. The tanks were installed and used by an owner twice-removed from the current owner; one of the interim owners, Kenneth Mumaw, exercised no control over and made no use of the tanks. The district court held that Mumaw was not liable, even though passive migration of hazardous substances hay have occurred during his ownership, because Mumaw did not take an active role in managing the tanks or their contents. *Nurad,* at 844. Thus, the district court "took the narrow view of the word 'disposal,' limiting it to disposal by affirmative human conduct." *Id.*

The Fourth Circuit persuasively considered and rejected this "strained" reading of the term "disposal." In an analysis this Court used above, the *Nurad* court looked at the terms used in the definition of "disposal" and determined that some were "primarily of an active voice"; however, other words "readily admit to a passive component: hazardous waste may leak or spill without any active human participation." *Id.* The district court "arbitrarily deprived these words of their passive element by imposing a requirement of active participation as a prerequisite to liability." *Id.* A prior Fourth Circuit decision had previously rejected that "strained reading" of the term "disposal." *United States v. Waste Indus., Inc.,* 734 F.2d 159, 164–65 (4th Cir.1984). Thus, a plain reading of CERCLA's definition requires the conclusion that an inadvertent leaking is a "disposal" within that statute.

As demonstrated by its prior attempts to distinguish other relevant cases, Stop–N–Go will be hot to distinguish CERCLA from Kentucky law now that there is a circuit decision four-square against Stop–N–Go's

---

**6.** The court decided *Nurad* eight days after The Pantry's final brief and thirteen days prior to

Stop–N–Go's final reply; neither party addressed the case.

position. Stop–N–Go would likely argue that the *Nurad* court's application of the term "disposal" is limited to and interdependent with the purposes of 42 U.S.C. § 9607(a)(2). That CERCLA section is concerned with allocating liability for a release that is already considered a violation by some other CERCLA provision. On the contrary, the Kentucky provision at issue is intended to prohibit a wrongful release in the first instance. This argument would fail for two distinct reasons.

First, the Fourth Circuit based its decision primarily on its plain reading of the language defining the term "disposal." Regardless the ultimate use of the term, be it for allocating liability or defining a prohibited release, the word "leaking" means what its says. A court cannot ignore the plain meaning of a term in a purported attempt to "keep with the spirit" when the plain meaning of terms in fact define the spirit and objective of a statute. Thus, to the extent that the overall purpose of CERCLA and § 224.40–100 differ, that difference is immaterial to a plain reading of their substantially identical language.

Second, even if the Court were to ignore principles of statutory application and look primarily to the purpose of § 224.40–100 to "construe" the term "leaking," the purpose of that section very probably includes prohibiting passive releases also. As with just about every other environmental statute, the Kentucky statute seems intended to prohibit all non-permitted releases. It is not a criminal statute requiring a guilty state of mind; it is a regulatory statute, which plainly may be violated by inadvertent conduct. Aside from the plain language of the definition of "disposal," the strongest argument against implying an unwritten "intent or knowledge" requirement into the term comes from another section of the Kentucky environmental statutes.

Section 224.99–010 provides the civil penalty for violating § 224.40–100. That section provides as follows:

Any person who violates ... KRS 224.-40–100 ... shall be liable for a civil penalty not to exceed the sum of five thou-sand dollars ($5,000) for said violation and an additional civil penalty not to exceed five thousand dollars ($5,000) for each day during which such violation continues, and in addition, may be concurrently enjoined from any such violation as hereinafter provided in this section and KRS 224.99–020.

Ky.Rev.Stat.Ann. § 224.99–010(2) (Michie/Bobbs–Merrill 1991). In addition, that section provides the criminal penalties for violating § 224.40–100:

Any person who knowingly violates ... KRS 224.40–100 ... shall be guilty of a class D felony, and upon conviction thereof, shall be punished by a fine not to exceed twenty-five thousand dollars ($25,000), or by imprisonment for a term of not less than one (1) year and not more than five (5) years, or by both find and imprisonment, for each separate violation. Each day upon which such violation occurs shall constitute a separate violation.

Ky.Rev.Stat.Ann. § 224.99–010(4) (Michie/Bobbs–Merrill 1991). Finally, a related section provides that "Nothing contained in this chapter shall abridge the right of any person to recover actual compensatory damages resulting form any violation of this chapter." Ky.Rev.Stat.Ann. § 224.99–020(3) (Michie/Bobbs–Merrill 1991).

Of course, if the terms of § 224.40–100 required intentional or knowing conduct, then there would be little purpose served by requiring that mental state as a separate element for criminal penalties. The civil penalties provided by § 224.99–010 require no mental state. Taken together with the Kentucky legislature's "knowing" use of the terms "leaking" and "spilling," the penalty section provides additional evidence that a person may be strictly liable for releasing waste, whether or not the person knew or intended such release. Therefore, the larger framework of Kentucky environmental protection laws makes plain that reading the term "leaking" to include passive releases does not lead to an absurd result that is obviously contrary to the purposes of the laws.

Discussing the other CERCLA and RCRA district court cases cited by the parties would provide a marginal academic benefit only. To the extent that such cases support the conclusion that the term "leaking" includes passive migration, they are merely cumulative persuasive evidence in support of an already firm conclusion. *See e.g., Zands v. Nelson,* 779 F.Supp. 1254, 1262 (S.D.Cal.1991). Each case cited by Stop–N–Go in favor of its strained reading of the term "leaking" is either inapplicable or otherwise unpersuasive.[7] The Kentucky law and all of its terms mean what they say. Ms. Haight's deposition statements providing her interpretation of § 224.40–100 are immaterial to the question of law regarding the scope that section. And finally, the EPA interpretive statements relate to CERCLA and RCRA only; but yet, to the extent they are persuasive, they support the Court's conclusion.

## CONCLUSION

Stop–N–Go did not have a permit to dispose of waste at any of its Kentucky Stores. Petroleum products, which constitute waste under Kentucky law, leaked from USTs at the Stores and were released into the surrounding soil and groundwater. Kentucky Revised Statute § 224.40–100 was in effect before and at the time the parties executed their contract. That section makes it unlawful to dispose of waste without a permit; a person may violate the statute by controlling USTs that leak waste, whether or not the person is aware or desires that the leak occurred. Therefore, Stop–N–Go violated § 224.40–100 during its ownership of the Stores and thereby violated the Environmental Warranties. The Pantry's Second Motion for Partial Summary Judgment is hereby GRANTED; Stop–N–Go's Cross–Motion for Partial Summary Judgment is DENIED. The Court will enter a Judgment finding in favor of The Pantry on the issue of liability arising from Stop–N–Go's breach of warranty caused by Stop–N–Go's violation of § 224.40–100. The appropriate remedy arising from this finding of liability will be determined at a later proceeding or at trial.

ALL OF WHICH IS ORDERED.

## SECOND JUDGMENT ON ISSUE OF LIABILITY

For the reasons stated in an Entry filed with this Judgment, The Pantry, Inc. is entitled to partial summary judgment as to the liability of Defendants Stop–N–Go Foods, Inc. and Tri–State Stop–N–Go, Inc. for breaching the parties' Asset Purchase Agreement with respect to the five Kentucky Stores.

Judgment is entered pursuant to Rule 56(c) of the Federal Rules of Civil Procedure finding in favor of The Pantry on the issue of liability with respect to The Pantry's claim that the condition of, and Stop–N–Go's use of, the Kentucky Stores materially breached warranty provisions of the Asset Purchase Agreement. The proper remedy will be determined subsequently.

ALL OF WHICH IS ORDERED.

---

**7.** Stop–N–Go argued that the district cases finding parties liable for leaking or spills all contained the fact that the parties discovered the condition and yet failed to remedy it. If that were true, then the same situation occurred in this matter. At the very latest, Stop–N–Go became aware of the petroleum releases on December 8, 1987; Stop–N–Go may have been aware of the situation as early as December 3 or 4, 1987, the date Losack received the test results. Stop–N–Go introduced no evidence and has not argued that it took any action to remediate the Kentucky Stores prior to or following December 18, 1987, the date the parties closed the Asset Purchase Agreement. Thus, Stop–N–Go had knowledge that the USTs leaked and released waste without a permit and yet apparently took no steps to remediate the sites.