966 F.2d 837
 35 ERC 1005, 122 A.L.R.Fed. 743, 60
USLW 2768,
22 Envtl. L. Rep. 20,936
 NURAD, INCORPORATED, Plaintiff-Appellant,
v.
WILLIAM E. HOOPER & SONS COMPANY; James E. Hooper, Jr.;
Kenneth B. Mumaw; All States Moving & Storage; Raymond
McMillan; Lawrence L. Hooper; Universal Laboratory
Installations, Incorporated; Monumental Millwork,
Incorporated, Defendants-Appellees.
Frank S. NICOLL, Jr.; Shareholders of Monumental
Enterprises, Incorporated; Sudler Moving &
Storage, Incorporated, Defendants,
v.
J. LANGRALL & SONS; Zemco Corporation; Chesapeake Envelope
& Print Company; Les Care Laminates, Third Party
Defendants.
NURAD, INCORPORATED, Plaintiff-Appellee,
v.
WILLIAM E. HOOPER & SONS COMPANY, Defendant-Appellant,
and
James E. Hooper, Jr.; Frank S. Nicoll, Jr.; Sharholders of
Monumental Enterprises, Incorporated; Kenneth B.
Mumaw; all States Moving & Storage.
Raymond McMILLAN; Lawrence L. Hooper; Universal Laboratory
Installations, Incorporated; Monumental Millwork,
Incorporated; Sudler Moving & Storage,
Incorporated, Defendants,
v.
J. LANGRALL & SONS; Zemco Corporation; Chesapeake Envelope
& Print Company; Les Care Laminates, Third Party
Defendants.
 Nos. 91-1775, 91-1790.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 4, 1992.
Decided May 29, 1992.
 
 Gina Monath Zawitoski, Piper & Marbury, Baltimore, Md., argued (Deborah E. Jennings and William W. Toole, on brief), for plaintiff-appellant.
 Mark Herbert Kolman, Anderson, Kill, Olick & Oshinsky, Washington, D.C., Pamela Janice White, George Whitthorne Kelly, Ober, Kaler, Grimes & Shriver, Baltimore, Md., Samuel A. Bleicher, Miles & Stockbridge, Washington, D.C., Robert John Carson, Smith, Somerville & Case, Baltimore, Md., Howard Kenneth Kurman, Offit & Offit, P.A., Lutherville, Md., argued (Marian Hwang, Miles & Stockbridge, Baltimore, Md., Charles R. Taylor, Jr., Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., on brief), for defendants-appellees.
 Before WILKINSON, Circuit Judge, WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 This is a suit brought by the current owner of a piece of property for reimbursement of costs it incurred in removing from the property some underground storage tanks and their hazardous contents. The current owner sought reimbursement from previous owners and tenants at the site, claiming that they were liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) as "owners" or "operators" of the facility at the time of "disposal" of the hazardous substances. 42 U.S.C. § 9607(a)(2). The district court entered summary judgment against the original owner of the tanks and in favor of the other defendants.
 
 
 2
 We think the district court was correct both in holding that the original owner was liable under CERCLA and in holding that the tenant defendants were not liable as "operators" of the facility in question. We think it erred, however, in absolving certain of the previous owner defendants on the ground that they were not owners "at the time of disposal." By requiring proof of affirmative participation in hazardous waste disposal as a prerequisite to liability under § 9607(a)(2); the district court misconstrued both the statutory definition of "disposal" and a decision of this court interpreting that definition. We think the statute plainly imposes liability on a party who owns a facility at the time hazardous waste leaks from an underground storage tank on the premises. Any other result would substantially undermine CERCLA's goal of encouraging voluntary cleanup on the part of those in a position to do so.
 
 I.
 
 3
 Plaintiff Nurad, Inc., brought this lawsuit to recover the costs it incurred in removing several underground storage tanks (USTs) from a piece of property it owns in Baltimore, Maryland. From 1905 to 1963, Wm. E. Hooper & Sons, Co. (the Hooper Co. or the Company) owned the site and adjacent properties, collectively known as Hooperwood Mills. At some point before 1935, the Hooper Co. began to install tanks for the storage of mineral spirits which it used to coat fabrics in its textile finishing plant. The Company continued to use the tanks for that purpose until 1962, when it shut down its finishing operations. At that time, the Hooper Co. abandoned the USTs and did not remove the mineral spirits.
 
 
 4
 In 1963, the Hooper Co. sold Hooperwood Mills to Property Investors, Inc. Frank Nicoll, as president and principal shareholder of Property Investors and its successor, Monumental Enterprises, Inc., leased several of the buildings on Hooperwood Mills to various tenants, none of which ever used the USTs. Then in 1976, Monumental Enterprises sold Hooperwood Mills to Kenneth Mumaw, who subdivided the property and sold a portion of it to Nurad.
 
 
 5
 Nurad's operations at the site involve the manufacture of antennae. In all its years at the site, Nurad apparently never used the USTs. In 1987, however, the Maryland Department of the Environment informed Nurad that the tanks had not been properly abandoned and required that they be removed from the ground or filled with sand or concrete within 180 days. Nurad sought assistance with the cleanup from several of the previous owners and tenants of the site, but they all refused. Nurad then hired an environmental consultant and a tank removal contractor to analyze the contents of the tanks and dispose of several of the tanks and the surrounding soil.
 
 
 6
 In 1990, Nurad filed this CERCLA suit, seeking reimbursement for approximately $226,000 in cleanup costs from former owners of the site (the Hooper Co., Nicoll, Mumaw, and Monumental Enterprises); from former tenants at the site (Allstates Moving & Storage, Raymond B. McMillan, Universal Laboratory Installations, Inc., and Monumental Millwork); and from James Hooper, Jr., and Lawrence Hooper (the Hooper brothers), who were shareholders and directors of the Hooper Co. The district court decided the issues of liability on summary judgment. In its view, only the Hooper Co. was liable under CERCLA for costs incurred by Nurad in removing the tanks. The court found that the tenant defendants did not qualify as "operators" because they did not possess sufficient authority to control the hazardous waste at the facility. Further, the court ruled that certain of the previous owners were not liable because they were not owners "at the time of disposal." According to the district court, "disposal" necessarily contemplated some element of affirmative participation on the part of the defendant, and only the original owner actively dealt with hazardous substances at the site. Accordingly, the court granted summary judgment against the Hooper Co. and in favor of the other defendants. The court also granted Nurad's motion to bifurcate the issues of liability and damages, and entered final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.
 
 Both Nurad and the Hooper Co. appeal.[1]
 II.
 
 7
 Congress enacted CERCLA to address the increasing environmental and health problems associated with inactive hazardous waste sites. The statute encourages private cleanup of such hazards by providing a cause of action for the recovery of costs incurred in responding to a "release" of hazardous substances at any "facility." 42 U.S.C. § 9607; H.Rep. No. 1016, 96th Cong., 2d Sess. 17, reprinted in 1980 U.S.C.C.A.N. 6119, 6120. Under CERCLA, a person who incurs such cleanup costs is entitled to recover from anyone who qualifies as a "responsible person" under the statute. 42 U.S.C. § 9607. Responsible persons include the current "owner" or "operator" of the facility, id. § 9607(a)(1), any person who "owned" or "operated" the facility at the time of "disposal" of a hazardous substance, id. § 9607(a)(2), any person who "arranged for disposal or treatment" of hazardous substances at the facility, id. § 9607(a)(3), and any person who accepts hazardous substances "for transport to disposal or treatment facilities, incineration vessels or sites," id. § 9607(a)(4). Any of these responsible persons is strictly liable for costs incurred in responding to the release of a hazardous substance at the facility. United States v. Monsanto Co., 858 F.2d 160, 167 (4th Cir.1988), "subject only to the defenses set forth in subsection (b)." 42 U.S.C. § 9607(a). The court has the authority to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Id. § 9613(f)(1).[2]
 
 
 8
 Here the district court found that Nurad's costs were in response to a release or threatened release of a hazardous substance under CERCLA. The issues on appeal concern the scope of the terms defining responsible persons under § 9607(a)(2)--specifically, the meaning of the terms "owned," "operated," "facility," and "disposal." We think it best to approach the meaning of those terms by considering Nurad's claims against the various parties who were prior owners or tenants at Hooperwood Mills.
 
 A.
 
 9
 We shall first address Nurad's claims against the former tenants at the site. The district court dismissed Nurad's claims against the tenant defendants on the grounds that they lacked the authority to control the USTs and therefore did not "operate[ ]" a "facility" under § 9607(a)(2). Nurad raises three objections to this aspect of the district court's ruling. First, Nurad contends that the district court applied the wrong legal standard in interpreting the word "operator." In Nurad's view, the court too narrowly defined that term to include only those persons who actually exercised control over the facility.
 
 
 10
 We do not agree with Nurad that the district court applied an improper standard. The district court applied the correct standard in holding that the tenant defendants need not have exercised actual control in order to qualify as operators under § 9607(a)(2), so long as the authority to control the facility was present. Although the court did note that the tenant defendants "never actively participated in the disposal of hazardous substances" at the site, the court's decision quite properly turned on the fact that they lacked "authority to control the operations or decisions involving the disposal of hazardous substances at the Site or the contents of the USTs" (emphasis added). Indeed, the district court's examination of the terms of the various leases in question indicated that it recognized that authority to control--not actual control--was the appropriate standard. This is the definition of the word "operator" that most courts have adopted, see, e.g., CPC Int'l, Inc. v. Aerojet-General Corp., 731 F.Supp. 783, 788 (W.D.Mich.1989); Idaho v. Bunker Hill Co., 635 F.Supp. 665, 671-72 (D.Idaho 1986), and it is one which properly declines to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup. Under this standard, the district court was entitled to consider a defendant's actual conduct as evidence of the authority to control, see, e.g., Riverside Market Dev. Corp. v. International Bldg. Prods., Inc., 931 F.2d 327, 330 (5th Cir.1991); New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir.1985), but it clearly did not inflate that item of evidentiary significance into a dispositive legal requirement.
 
 
 11
 Second, Nurad objects to the district court's interpretation of the word "facility." Liability under § 9607(a)(2) extends to any person who "operated any facility" at which hazardous substances were disposed of, and the district court proceeded on the premise that the "facility" in this case was confined to the USTs.[3] Nurad contends that the "facility" at issue here encompassed the entire Nurad site, so that the proper inquiry is whether the tenant defendants had control over any portion of that site, not just the storage tanks.
 
 
 12
 We disagree. CERCLA defines "facility" to include a "building, structure, ... storage container" or other "area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). In this case, the only "area" where hazardous substances have "come to be located" is in and around the storage tanks, so the relevant "facility" is properly confined to that area. To be sure, the tanks are a part of the larger piece of property that is now the Nurad site. During the relevant period, however, the site was subdivided and separate portions of it were leased out to individual tenants. The fact that those tenants may have had control over a building that was adjacent to the USTs is irrelevant under the statute; a defendant operates a "facility" only if it has authority to control the area where the hazardous substances were located. Thus, while liability under § 9607(a)(2) is strict, Monsanto, 858 F.2d at 168, it nonetheless extends only to those who have authority over the area where hazardous substances are stored. The statute places accountability in the hands of those capable of abating further environmental harm, while Nurad's proposed definition of "facility" would rope in parties who were powerless to act.
 
 
 13
 Finally, Nurad contends that even if the court applied the correct legal standard, it erred in its factual determination that the tenant defendants lacked the authority to control the USTs. Nurad contends that as lessees the tenants had a property interest that necessarily included the implicit authority to control the portion of the site that contained the USTs. We agree with the district court, however, that the terms of the tenants' lease agreements conclusively establish that their authority as tenants did not extend to the USTs. Defendant Allstates Moving & Storage, for example, leased parts of several buildings on the Nurad site to conduct its freight transfer and storage operations from 1966 to 1979, but Allstates' lease agreements never conferred upon it any authority over the USTs, which were under the active management of the landlord. The initial lease demised to Allstates the "1st floor of Building 4C," and limited it to use "as an office and warehouse for the storage of furniture[,] appliances, and other such equipment and material consistent with the business of the tenant." In addition, the lease demised to Allstates use of the following common areas:
 
 
 14
 the lavatory marked I and the parking area marked II and ... the railsiding in the said complex to spot boxcars plus the ... driveways to the siding in order to load and unload goods stored in the demised premises.
 
 
 15
 Subsequent lease agreements demised to Allstates portions of other buildings on the site, but none expanded its authority to use any common areas other than those specifically identified in the initial agreement, and none purported to give Allstates authority to use the areas where the tanks were situated.
 
 
 16
 The other tenant defendants also lacked authority to control the USTs. Universal Laboratory Installations, Inc., occupied portions of two of the buildings at Hooperwood Mills under an oral lease for nine months during 1972. Universal used the buildings as an office and storage facility for its cabinet installation business. Under Universal's oral agreement, it had the right to occupy specific portions of the two buildings, rights of ingress and egress to those buildings, and the right to use the loading dock. Monumental Millwork leased a portion of one of the buildings at the site from 1969 to 1978 for use as an office and for the assembly and storage of doors and windows. Nurad makes broad assertions about both Universal's and Millwork's authority over the Nurad site, but has adduced no evidence sufficient to contradict the trial court's conclusion that they had no authority to control the USTs or their contents.
 
 
 17
 Given the precise language of the lease agreements and the absence of any express authority to use the USTs, we think it would be unreasonable to assume that the tenant defendants possessed any implicit authority to exercise control over the tanks. Indeed, Nurad's suggestion that these tenants had some de facto authority over the USTs is inconsistent with the landlord's actual practice, which required a separate lease agreement when in 1966 the Hooper Co., then a tenant, sought to use one of the tanks. Under the circumstances, the tenant defendants may even have been trespassing if they had attempted to assume the role of "operator" of the USTs. We thus agree with the district court that each of the tenant defendants--Allstates Moving & Storage, Universal Laboratory Installations, and Monumental Millwork--was entitled to summary judgment. Since Nurad's only allegations against McMillan were that he was president and sole shareholder of Allstates, our holding requires that McMillan be granted summary judgment also.
 
 B.
 
 18
 Next we address Nurad's claims against James and Lawrence Hooper. Nurad contends that the district court erred in finding that the Hooper brothers did not qualify as operators. Even if we assume that a corporate officer may be held personally liable as an operator, see Shore Realty, 759 F.2d at 1052, we agree with the district court that the Hooper brothers lacked the requisite authority to control the USTs or to prevent the disposal of hazardous waste at the site. It is true that the Hooper brothers were vice presidents of the Hooper Co. beginning in the early 1960s. Any authority they possessed was entirely subordinate to that of their father, however, who as president and majority stockholder exercised ultimate authority over the finishing plant. The senior Hooper was not anxious to cede this authority to his sons; an uncontradicted affidavit described him as "a man of strong will and temperament suited to running the entire affairs of the corporation, which he did." Nurad has failed to direct our attention to any evidence that would undermine the district court's conclusion that "James Hooper, Sr., as president during the relevant times, retained all decision-making authority over the company including the daily operations at the finishing plant," and that the younger Hoopers should accordingly not face CERCLA liability.[4]
 
 C.
 
 19
 Finally, we address Nurad's claims against the previous owners of the site, the Hooper Co. and Kenneth Mumaw. Neither the Hooper Co. nor Mumaw appeals from the district court's conclusion that they are prior owners of the facility. At oral argument, Mumaw did direct our attention to the fact that he held legal title to the property for only a short period of time. We do not think, however, that the word "owned" is a word that admits of varying degrees. Such equitable considerations as the duration of ownership may well be relevant at a later stage of the proceedings when the district court allocates response costs among liable parties, see 42 U.S.C. § 9613(f)(1), but we reject any suggestion that a short-term owner is somehow not an owner for purposes of § 9607(a)(2).
 
 
 20
 Because both the Hooper Co. and Mumaw are prior owners of the facility, we must ask whether recovery against them is nonetheless barred because no "disposal" of hazardous wastes took place on their watch. The district court took a narrow view of the word "disposal," limiting it to disposal by affirmative human conduct. Thus, the court concluded that the Hooper Co. was liable because it actively disposed of hazardous substances and then abandoned them in the USTs. The court held, however, that Mumaw was not liable--even though passive migration of hazardous substances may have occurred during his ownership--since he did not take an active role in managing the tanks or their contents.
 
 
 21
 We think the district court's restrictive construction of "disposal" ignores the language of the statute, contradicts clear circuit precedent, and frustrates the fundamental purposes of CERCLA. The statute defines "disposal" in 42 U.S.C. § 9601(29) by incorporating by reference the definition found in the Resource Conservation and Recovery Act (RCRA). That definition states:
 
 
 22
 The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.
 
 
 23
 42 U.S.C. § 6903(3). Some of the words in this definition appear to be primarily of an active voice. See Ecodyne Corp. v. Shah, 718 F.Supp. 1454, 1457 (N.D.Cal.1989). This is true of "deposit," "injection," "dumping," and "placing." Others of the words, however, readily admit to a passive component: hazardous waste may leak or spill without any active human participation. The district court arbitrarily deprived these words of their passive element by imposing a requirement of active participation as a prerequisite to liability.
 
 
 24
 Indeed, this circuit has already rejected the "strained reading" of disposal which would limit its meaning to "active human conduct." United States v. Waste Ind., Inc., 734 F.2d 159, 164-65 (4th Cir.1984). In Waste Industries, the court held that Congress intended the 42 U.S.C. § 6903(3) definition of disposal "to have a range of meanings," including not only active conduct, but also the reposing of hazardous waste and its subsequent movement through the environment. Id. at 164. Here the district court attempted to distinguish Waste Industries on the ground that it involved the authority of the Environmental Protection Agency to demand cleanup by former owners and operators under RCRA. The district court thought that the Waste Industries definition was necessary to close a loophole in RCRA's environmental protection scheme, see id. at 165, and believed "that the only way for the Waste Industries court to preserve the EPA's ability to demand cleanup by the actual former owners and operators was to define 'disposal' in RCRA to cover completely passive repose or movement through the environment." In this CERCLA action, by contrast, the district court noted that the current owner and all prior owners were already defendants and in some cases were liable for cleanup costs.
 
 
 25
 We think the district court was bound to follow Waste Industries in interpreting the term "disposal." It is true that Waste Industries interpreted the definition in the context of RCRA, but Congress expressly provided that under CERCLA the term "shall have the meaning provided in section 1004" of RCRA (42 U.S.C. § 6903(3)). 42 U.S.C. § 9601(29). Moreover, the aim of both RCRA and CERCLA is to encourage the cleanup of hazardous waste conditions. Whether the context is one of prospective enforcement of hazardous waste removal under RCRA or an action for reimbursement of response costs under CERCLA, a requirement conditioning liability upon affirmative human participation in contamination equally frustrates the statutory purpose.
 
 
 26
 It is easy to see how the district court's requirement of active participation would frustrate the statutory policy of encouraging "voluntary private action to remedy environmental hazards," In re Dant & Russell, Inc., 951 F.2d 246, 248 (9th Cir.1991). Under the district court's view, an owner could avoid liability simply by standing idle while an environmental hazard festers on his property. Such an owner could insulate himself from liability by virtue of his passivity, so long as he transfers the property before any response costs are incurred. A more conscientious owner who undertakes the task of cleaning up the environmental hazard would, on the other hand, be liable as the current owner of the facility, since "disposal" is not a part of the current owner liability scheme under 42 U.S.C. § 9607(a)(1). See Shore Realty, 759 F.2d at 1044. The district court's view thus introduces the anomalous situation where a current owner, such as Nurad, who never used the storage tanks could bear a substantial share of the cleanup costs, while a former owner who was similarly situated would face no liability at all. A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind.
 
 
 27
 The district court's view of the CERCLA definition of disposal is also at odds with CERCLA's strict liability emphasis. The trigger to liability under § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination. See Monsanto, 858 F.2d at 168 ("The traditional elements of tort culpability on which the site-owners rely simply are absent from the statute."); Shore Realty, 759 F.2d at 1044 (noting that Congress specifically rejected a causation requirement). We must decline therefore to engraft onto the statute additional prerequisites to the reimbursement of response costs which Congress did not place there.
 
 
 28
 Thus, we hold that § 9607(a)(2) imposes liability not only for active involvement in the "dumping" or "placing" of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was "spilling" or "leaking." The only remaining question is whether a statutory disposal of hazardous waste occurred during the period of Hooper's and Mumaw's ownership.
 
 
 29
 We think for the following reasons that it did. Initially, the record supports the conclusion that both the Hooper Co. and Mumaw owned the facility at a time when the mineral spirits were "leaking" from the tanks. Nurad has established that the Hooper Co. began to install the USTs some time before 1935 and that mineral spirits reposed in the tanks until they were removed by Nurad in 1988-89. Nurad has further presented uncontroverted evidence that at the time the tanks were removed the soil around several of the tanks was contaminated with mineral spirits. Indeed, the district court found that the "mineral spirits in the excavated soil show an exact chromatographic match" with those in one tank, and that another of the tanks had "corrosion holes in the bottom and was underlain by discolored soils that emanated solvent odors." Neither the Hooper Co. nor Mumaw has pointed to anything to overcome the presumption that the leaking that has occurred was not a sudden event, but the result of a gradual and progressive course of environmental contamination that included these defendants' period of ownership. We do not think in such circumstances that Congress intended to impose upon a CERCLA plaintiff the onerous burden of pinpointing at what precise point a leakage may have begun. This circuit has been careful not to vitiate what was intended as remedial legislation by erecting barrier upon barrier on the road to reimbursement of response costs. As this court emphasized in rejecting a requirement that a CERCLA plaintiff prove a nexus between waste sent by a particular defendant to a particular site and the resulting environmental harm:
 
 
 30
 Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source.... "To require a plaintiff under CERCLA to 'fingerprint' wastes is to eviscerate the statute."
 
 
 31
 Monsanto, 858 F.2d at 170 (quoting United States v. Wade, 577 F.Supp. 1326, 1332 (E.D.Pa.1983)).
 
 
 32
 Finally, we agree with the district court that the Hooper Co.'s claim that there was no statutory disposal is especially insubstantial. The Company disposed of hazardous substances at the site by depositing them in the USTs and abandoning them upon closing its finishing plant in 1962. The statute provides that "disposal" includes the "placing" of any hazardous waste "into or on any land" so that such hazardous waste "may enter the environment," 42 U.S.C. § 6903(3), and courts have specifically held that depositing hazardous waste into enclosed containers fits this definition. See, e.g., Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp., 737 F.Supp. 1272, 1278 (W.D.N.Y.1990), aff'd, 964 F.2d 85 (2d Cir.1992). Even if we accept the Hooper Co.'s argument that the storage of useful mineral spirits for active use as a raw material cannot constitute disposal because it is not "waste," see 3550 Stevens Creek Assoc. v. Barclays Bank, 915 F.2d 1355, 1362 (9th Cir.1990), we think there clearly was a disposal in 1962 when the Company closed down the finishing plant and abandoned the tanks. At that point, the mineral spirits clearly became "waste," as they were abandoned and were apparently never again used. See 40 C.F.R. § 261.2 (defining waste as any "discarded" material, or material which has been "abandoned"). The Hooper Co. is quick to point out that it later "sold" the USTs and their contents to Property Investors, but we agree with the district court that the sale of the previously abandoned tanks to a real estate investor--who had no use for the mineral spirits or the tanks and apparently never used them--cannot reverse the earlier disposal. A defendant who has abandoned hazardous materials at a site cannot escape CERCLA liability by simply labelling a subsequent transfer of the property as a "sale" of the hazardous waste. See United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1381 (8th Cir.1989) ("[C]ourts have imposed CERCLA liability where defendants sought to characterize their arrangement with another party who disposed of their hazardous substances as a 'sale' rather than a 'disposal.' ")
 
 III.
 
 33
 In sum, Nurad is entitled to reimbursement from some of the prior occupants of Hooperwood Mills, but not from all. We affirm the district court's dismissal of Nurad's claims against each of the tenant defendants and against the Hooper brothers, and we affirm the entry of summary judgment in Nurad's favor against the Hooper Co. We reverse the district court's denial of Nurad's motion for summary judgment as to Mumaw. We remand the case for further proceedings consistent with this opinion.
 
 
 34
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 Nurad appeals from the district court's order granting the motions for summary judgment filed by the Hooper brothers, Kenneth Mumaw, Allstates Moving & Storage, Raymond McMillan, Universal Laboratory Installations, Inc., and Monumental Millwork. Frank Nicoll did not move for summary judgment, and is not a party to this appeal. The Hooper Co. appeals from the district court's order denying its motion for summary judgment and granting Nurad's motion as against the Company
 
 
 [2]
 The statute also provides that costs will be recoverable only if they are "necessary" and "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). The district court in this case granted Nurad's motion to resolve the issues of necessity of the costs and consistency with the national contingency plan at the damages phase. The court's decision to bifurcate was based on its view that the record on these issues was incomplete. Under the circumstances, the decision to bifurcate was well within the court's discretion. See County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1513 (10th Cir.1991), and cases cited therein
 
 
 [3]
 The district court purported to sidestep the issue of whether to define the "facility" to encompass the entire Nurad property, but its analysis reveals that it considered the facility to be limited to the USTs. In concluding that the tenant defendants did not "operate" the "facility," for example, the court reasoned that they "lacked the requisite degree of control over the USTs."
 
 
 [4]
 Nurad insists that the district court failed to give proper weight to the fact that the Hooper Co. resumed its finishing operations as a tenant in 1966 in two buildings that the Company leased from Property Investors. Nurad suggests that during that period the Hooper brothers controlled the underground tank then in use, denominated the "building 28 tank." The district court found, however, that Mr. Hooper, Sr., was at that time still in a position to exercise absolute control over the Company. Moreover, Nurad has conceded that the building 28 tank is not on the Nurad site and is not a subject of this suit, so that the Hooper brothers' control of that tank cannot affect their status as operators of the facility in question