UNITED STATES of America, Plaintiff,

v.

TIC INVESTMENT CORP., TIC United
Corp., Stratton Georgoulis,
Defendants.

ALLIED PRODUCTS CORP., Plaintiff,

v.

TIC INVESTMENT CORP., TIC United
Corp., Stratton Georgoulis,
Defendants.

No. C91–2065.

United States District Court,
N.D. Iowa, Eastern Division.

Sept. 19, 1994.

Robert L. Driscoll, Russell A. Berland, Stinson, Mag & Fizzell, P.C., Kansas City, IA, Thomas R. Buresh, Moyer & Bergman, Cedar Rapids, IA, for plaintiff—Allied Products Corp.

Sean Carman, Michael McNulty, U.S. Dept. of Justice, Environmental Enforcement, Washington, DC, David Cozad, U.S. En. Pr. Ag., Region VII, Kansas City, KS, Lawrence D. Kudej, Asst. U.S. Atty., N.D. Iowa, Cedar Rapids, IA, for U.S.

Daniel M. Dibble, Gary D. Justis, Lathrop & Norquist, Kansas City, MO, Kimberly J. Walker, Faegre & Benson, Des Moines, IA, for defendants.

## OPINION and ORDER

MELLOY, Chief Judge.

This matter is before the court on cross motions for summary judgment as to defendants liability under § 107(a) of CERCLA, 42 U.S.C. 9607(a). Considered within this opinion and order are Defendants' Motion for Partial Summary Judgment Against USA and for Summary Judgment Against Allied (Document Number 80), filed October 21, 1993; the United States' Motion for Partial Summary Judgment on Liability under Section 107 of CERCLA, (Document Number 92), filed October 22, 1993; and Allied's Motion for Partial Summary Judgment Against Defendants (Document Number 95), filed October 22, 1993. This order denies defendants' motion for summary judgment in part and declines to rule in part, grants Allied Products Corp.'s motion for summary judgment in part, denies it in part and declines to rule in part, and declines to rule on the United States' motion for summary judgment.

### Background

White Farm Equipment Company (WFE) owned and operated a farm implement manu-

facturing plant in Charles City, Iowa from 1971 through 1985. The Charles City manufacturing facility was one of several WFE operating locations in the United States, all of which reported to WFE headquarters in Oak Brook, Illinois. Beginning in 1971 and continuing to the present, the waste from the Charles City plant has been disposed of at a disposal site (dumpsite) owned by H.E. Construction Co. H.E. Construction transported WFE's foundry waste to the property and disposed of it there, charging WFE on a per load basis.

In 1979, WFE signed a lease agreement with H.E. Construction in which WFE leased the dumpsite for a two year period, for $1.00. After this lease expired, no new lease was executed, but WFE continued to utilize the dumpsite for disposal of its waste.

In December 1980, White Farm U.S.A., Inc., an investment holding company, became the sole holder of WFE stock when the stock was purchased from White Motor Corporation pursuant to an order from a United States Bankruptcy Court. From December 1980 through October 1985, WFE was wholly owned by White Farm U.S.A. which in turn was wholly owned by White Farm Industries, Inc. TIC Investment Corp. (TICI) wholly owned White Farm Industries from December 1980 through December 1981 at which time TIC United (TICU) took over ownership of White Farm Industries. Defendant Stratton Geourgoulis was the sole shareholder of TICI and TICU during the periods each separately owned WFE. The corporations, excepting WFE, are all holding companies. The employees were all paid through TIC Services Co., which provided corporate services to all TICI and TICU's subsidiaries.

There is no evidence that Geourgoulis or any employee of TIC Services had personal knowledge of the Charles City plant's waste disposal practices or that they participated in any way with waste disposal decisions of any of the subsidiary corporations. It is disputed whether Geourgoulis or any employee of TIC Services had knowledge of the lease with H.E. Construction.

TIC Services, a subsidiary of TICI, provided services to WFE and all other TIC subsidiaries which included insurance, accounting, legal and tax services. Each subsidiary was billed a corporate charge for these services. TIC Services initially calculated the fee to be charged by totaling its indirect costs and dividing the cost among the subsidiaries in proportion with each subsidiary's total sales. Prior to 1983, TIC Services would then diverge from this formula and assess WFE a lower proportion of the costs. In 1983 TIC Services added 40% to WFE's proportional share of the corporate fee. However, in May of 1983, WFE was refinanced by Borg–Warner Acceptance Corporation (BWAC) and BWAC imposed limitations on the corporate fee that TIC Services Co. could charge; consequently the additional 40% TIC Services had intended to charge was never collected. TIC Services also paid the salaries of the chief executive officer of WFE in 1982 and 1983 and billed WFE for reimbursement until BWAC insisted that this practice be curtailed.

Stratton Geourgoulis was the president of WFE from December 19, 1980 to November 23, 1981. From May 1, 1980 through March 27, 1985, he was Chairman of the corporate boards of the following corporations: WFE, White Farm U.S.A., White Farm Industries, Inc., TIC Services Co., and TICI. Geourgoulis was also president of TIC Services, Co. and TICI from May 1980 to March 1985 and president and Chairman of the Board of TICU from the time it was formed through March of 1985.

From TICI's acquisition of WFE until 1983, WFE's Board consisted of two persons, Stratton Geourgoulis and Dean Marcy, Vice President of Finance of TIC Services.

Borg–Warner Acceptance Corporation (BWAC) the major lender for WFE, and White Farms U.S.A. entered into a capital and revolving loan agreement in May 1983 for the refinancing of WFE. Under this $15 million agreement, WFE was required to expand its Board of Directors to five members. BWAC and White Farm U.S.A. were to nominate one member each and together the two corporations were to choose three neutral nominees to the Board. Pursuant to this agreement, Geourgoulis remained on the Board as White Farm's nominee through

March of 1985 and Dean Marcy remained on the Board as a neutral nominee until his resignation in 1984. The remaining positions on the Board were filled by various other persons.

WFE defaulted on its loan agreement with BWAC in May 1985. BWAC, as priority lienholder of WFE's assets, became the owner of all WFE assets at this time. BWAC sold WFE's assets to Allied in October 1985.

The United States and Allied brought separate actions against the defendants for recovery of response costs under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9607 for cleanup costs incurred at the WFE dumpsite. On February 12, 1993 this court consolidated the separate actions.

### CERCLA Liability

The recognized purposes of CERCLA legislation are (1) to ensure that those responsible for the problems caused by hazardous wastes are required to pay for the clean-up costs, *U.S. v. Maurice M. Taylor, Sr., et al.,* 1993 U.S.Dist. LEXIS 19082 (W.D.Mich. Dec. 9, 1993) and (2) to ensure that responsible persons are not allowed to avoid liability by remaining idle. *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 845 (4th Cir.1992).

An individual is liable to another for response costs under CERCLA § 107(a), 42 U.S.C. § 9607(a) if:

(1) the site in question is a "facility" as defined in § 101(9), 42 U.S.C. § 9601(9);

(2) a "release" or "threatened release" of a hazardous substance from the site has occurred;

(3) the release or threatened release has caused response costs consistent with the National Oil and Hazardous Substances Pollution Contingency Plan to be incurred; and

(4) the defendant is a responsible person under § 107(a)(1)–(4).

In this action, the "facility" is the WFE dumpsite owned by H.E. Construction. The parties are not disputing the existence of the first three elements, however, they do dispute whether the defendants are responsible persons under CERCLA. To be a responsible person under CERCLA, a defendant must fall within one of the following categories of persons:

(1) an owner and operator of a facility at which a release or threatened release of hazardous substances exists;

(2) an owner or operator of such a facility at any time when hazardous substances were disposed of on the facility;

(3) any person or entity who "arranged for" the treatment or disposal of a hazardous substance at the facility; and

(4) any person who transports hazardous substances to the facility. *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1377 (8th Cir.1989) (hereinafter *"Aceto"*); 42 U.S.C. § 9607(a).

The United States has sued the defendants under § 107(a)(3) of CERCLA claiming liability of the defendants as arrangers because of the improper disposal of WFE waste at the H.E. Construction dumpsite. The United States asserts liability against each defendant directly and derivatively based on the common law doctrine of "piercing the corporate veil." Allied has sued the defendants under CERCLA for response costs it claims it has incurred in connection with cleaning up the dumpsite. Allied asserts the defendants are liable under § 107(a)(2) as owners and operators of the dumpsite, and under § 107(a)(3) as arrangers, and under both of these sections through the common law theory of "piercing the corporate veil." The United States has asked for summary judgment only in relation to its claim that the defendants are derivatively liable on the theory of piercing the corporate veil. Allied has asked for summary judgment on each of its theories of liability and the defendants ask for summary judgment that it is not liable under either §§ 107(a)(2) or (3), either directly or derivatively through piercing the corporate veil. Because this court finds the defendants are directly liable under § 107(a)(3) as an arranger, this court declines to rule on the defendants' possible liability through piercing the corporate veil.

## Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Robinson v. Monaghan,* 864 F.2d 622, 624 (8th Cir.1989) (quoting Fed.R.Civ.P. 56(c)). Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and "by affidavit or otherwise" designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## Owner–Operator Liability

■ Allied moves for summary judgment against the defendants as owners and operators of the dumpsite asserting defendants, through WFE's lease of the site, "owned and operated" it. Defendants make a cross motion for summary judgment asserting that WFE cannot be considered an owner as it never held legal title to the dumpsite and, it cannot be considered an operator as H.E. Construction maintained control of the property.

WFE leased the land specifically as "a dumping ground for disposing of its casting facility's solid waste material." *Lease between H.E. Construction Co., Inc. and WFE,* dated May 16, 1979. The lease was for two years and ran from June 1979 to June 1981. The lease stated that H.E. Construction remained "the owner in possession and control" of the property. Although the lease was not renewed, WFE continued to use the dumpsite throughout TICI and TICU's ownership of WFE.

Allied asserts WFE controlled the site in that, at least once-a-month, a manager from the Charles City plant would visit the site to determine where waste should be disposed of at the site. The same manager is asserted to have addressed problems concerning access to the dumpsite by unauthorized individuals and water run-off with persons from H.E. Construction.

■ 42 U.S.C. § 9607(a)(2) imposes strict liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." Courts, when determining the liability of a lessee as an "owner-operator," generally look to how much control over and responsibility for the use of the site the lessor maintains. *Nurad,* 966 F.2d at 842; *Pierson Sand and Gravel, Inc. v. Pierson TWP.,* 851 F.Supp. 850 (W.D.Mich.1994); *U.S. v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 1003 (D.S.C.1984) *rev'd in part on other grounds.* Of particular import in finding lessee liability is the degree of control that the lessee is able to exert "over the activity *on the property* which directly results in the release or threatened release of hazardous substances." *CPC Int'l. Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 789 (W.D.Mich. 1989) (emphasis added). Cases finding lessee liability as an owner-operator, concentrate on the fact that the lessee was an operator of the activity directly causing the release of hazardous waste. *U.S. v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 484 (8th Cir.1992) (owner and operator of leaking oil tanks sitting on leased land was owner-operator for CERCLA purposes); *Weyerhaeuser Corp. v. Koppers Co.,* 771 F.Supp. 1406 (D.Md.1991) (operator and lessee of wood treatment plant liable as owner-operator). Where a lessee has no authority to control the activity causing damage, he is not liable as "owner-operators." *See Nurad,* 966 F.2d at 843 (tenants who had no authority to exercise control over the leaking tanks were not liable under CERCLA).

In the case at bar, the lease states that the lessor maintained all control over the property, however, Culbert's affidavit suggests WFE in actuality did exert some control. Whether defendants either directly or derivatively, exerted enough control over the property such that they should be held liable as an owner or operator is the subject of a material factual dispute, hence, summary judgment on this issue is not appropriate.

## Arranger Liability

Both Allied and the United States contend the defendants "arranged for" the disposal of hazardous waste at the facility within the meaning of 42 U.S.C. § 9607(a)(3). Plaintiffs assert arranger liability arises where a party

had the authority to control the hazardous waste disposal causing the contamination of the facility in question. Defendants assert that the mere authority to control waste disposal is not enough to cause liability to attach. They assert that they cannot be held liable as arrangers unless it is shown that they actually participated in waste disposal decisions. The United States has moved for summary judgment only on the claim that the defendants are derivatively liable as an arranger by piercing the corporate veil. Allied has moved for summary judgment on both derivative and direct liability of the defendants as arrangers.

A party is responsible as an "arranger" if he or she "by contract, agreement, or otherwise arranged for disposal ... of hazardous substances...." 42 U.S.C. § 9607(a)(3) (1986). "Arranged" is not defined in the statute, however, courts have defined the term liberally in order to achieve CERCLA's remedial purpose. *Florida Power and Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir.1990); *Aceto*, 872 F.2d 1373; *United States v. Northeastern Pharmaceutical and Chemical Co.*, 810 F.2d 726, 733 (8th Cir.1986) (hereinafter *"NEPACCO"*). Further, in determining who qualifies as a "responsible person," the Eighth Circuit has found that the policy underlying CERCLA supports finding liability where "[a]ny other decision, ... would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances...." *Aceto*, 872 F.2d at 1382.

### Georgoulis as Corporate Officer

■ Allied asserts summary judgment against Georgoulis as an arranger is warranted as Georgoulis possessed the ultimate authority to control waste disposal at WFE. Geourgoulis does not dispute that he had the ultimate authority to make decisions at WFE, however he states summary judgment against plaintiffs is required as he had no knowledge of and exerted no actual authority over WFE's waste disposal practices. Defendants assert that some affirmative action in regards to waste disposal by the officer is necessary before a corporate officer can be held directly liable under CERCLA.

The Eighth Circuit has stated that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme." *NEPAC-CO*, 810 F.2d at 743; *Mexico Feed*, 980 F.2d 478. Defendants assert this statement is merely dicta as the Eighth Circuit has only found CERCLA liability where the defendant actually participated in waste disposal decisions. However, other courts which have adopted the "authority to control" test, have clarified that they merely look to the defendant's actual control over hazardous waste procedures as establishing that the defendant had the authority to control disposal and not as a prerequisite to finding liability. *Nurad*, 966 F.2d 837; *City of North Miami, Fla. v. Berger*, 828 F.Supp. 401 (E.D.Va.1993). The defendants contend that the authority to control test has only been used to attach liability to persons as "operators" under § 107(a)(2) of CERCLA and not as "arrangers" and should therefore not be extended to those charged with arranger liability. However, the Eighth Circuit has used this test under a similar environmental statute to determine the liability of a corporate president and shareholder for the damage caused by the waste his corporation disposed of off the corporation's property. *See NEPACCO*, 810 F.2d at 745 (corporate president and shareholder liable as "contributor" under the Resource Conservation and Recovery Act (RCRA)). Therefore, the "authority to control" test appears equally appropriate to determine liability as an "arranger" under CERCLA. Further, to hold that liability should be determined differently depending on whether the corporation disposed of waste on its own facility or at a facility off the corporation's property would open a large gap in CERCLA legislation allowing corporate officers to escape liability merely by shipping its hazardous waste offsite. Moreover, the authority to control test is appropriate for arranger liability as to hold otherwise would encourage persons in authority to turn a blind eye to the method of disposal of their corporation's hazardous substances. This would contravene the underlying policy of CERCLA. *See Aceto*, 872 F.2d at 1382.

■ When addressing the issue of whether an individual had the "authority to con-

trol" hazardous waste disposal activities of a corporation, the important factors are whether the individual was a majority stockholder of the corporation, whether the individual held a position on the corporation's board, or was an officer of the corporation, and whether the individual exercised actual authority over the corporation. *See NEPACCO,* 810 F.2d at 745 (major shareholder and corporate president found liable); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052–53 (2nd Cir.1985) (president and majority stock holder who exercised ultimate authority over the corporation was found liable as an operator); *U.S. v. Carolina Transformer Co.,* 978 F.2d 832 (4th Cir.1992) (sole stockholder, and president of nineteen years, chairman of the board for four years who acknowledged he was "in charge of the company and 'responsible' for what went on there" was held liable as an operator; a second defendant was held liable as he was a director for eleven years, president for three years, and stated that as the president his responsibilities included everyday operations of the company); *Nurad,* 966 F.2d 837 (two vice-presidents of a company were not found liable where the president was the majority stockholder, and retained all decision-making authority over the company).

■ Applying these factors to the case at bar, the following facts are undisputed. Geourgoulis was the sole stockholder of TICI and TICU. TICI and TICU, through White Farm Industries, Inc., and White Farm U.S.A. were the sole owners of WFE. Geourgoulis was the president of WFE from December 19, 1980 through November 23, 1981. He was Chairman of the WFE Board of Directors from May 1, 1980 through March 27, 1985. From May 1, 1980 to December 31, 1985, Geourgoulis also held the following positions: Chairman of the Board, White Farm U.S.A., Inc; Chairman of the Board, White Farm Industries, Inc.; Chairman of the Board of Directors and President, TIC Services Co.; Chairman of the Board of Directors and President, TICI. Geourgoulis was also President and Chairman of the Board of Directors of TICU from the time of its formation through March of 1985.

The Bylaws of WFE gave Geourgoulis, as president, "general management and control of the business and affairs of the corporation" and made the president the "managing executive officer of the corporation."[1] Therefore, due to Geourgoulis' position as sole stockholder, Chairman of the WFE Board, and president of WFE, he had the authority to assert control over the hazardous waste disposal arrangements of WFE.

■ The final factor courts consider is the degree of control the defendant actually exerted over the corporation. Defendants contend that plaintiffs must show that Geourgoulis exercised actual control over the daily operations of the corporation, however, courts determining "operator" liability have determined that control over daily operations is not necessary. *See Donahey v. Bogle,* 987 F.2d 1250 (6th Cir.1993) (sole shareholder of a company that deposited its waste materials at a facility which it leased was a responsible party even though the shareholder did not actively participate in the day-to-day activities of the corporation and had no knowledge of the environmental contamination created by it); *Pierson Sand and Gravel,* 851 F.Supp. at 855 (no need to show day-to-day management, as authority to control is sufficient to confer operator status). The necessity for showing that the defendant actually exercised his or her authority is to establish that the defendant was not a mere figurehead, and that he or she played more than a passive role in the corporation. Whether an individual chooses to exercise all the authority he or she has over a corporation is not relevant under the statutory scheme as one purpose of CERCLA is to encourage those individuals with the power to do so, to take action to abate the damage caused by hazardous waste disposal. *See Nurad,* 966 F.2d at 845. To allow those in authority to escape liability because they chose to oversee certain aspects of their corporation, yet ignore hazardous waste disposal practices, would defeat the purpose behind the legislation. *See*

1. Although Geourgoulis asserts he was in actuality only an "acting" president, nothing within the bylaws or presented by defendants suggest that as acting-president, Geourgoulis had any less authority over WFE.

*United States v. Taylor,* 1993 U.S.Dist. LEXIS 19082, at *23.

The undisputed evidence shows that Geourgoulis was not a mere figurehead of WFE or a passive stockholder. The offices of TICI and TICU were headquartered in Dallas, Texas, yet Geourgoulis was often present at WFE's corporate office in Oakbrook, Illinois. Geourgoulis talked daily, sometimes several times a day, with Robert Fuller, vice president and later president of WFE, and James Slife, chief financial officer of WFE about ongoing problems at WFE. Geourgoulis directed David Finatri, WFE Vice President of Personnel and Industrial Relations, to renegotiate WFE's union contracts. Finatri also provided Geourgoulis with continual reports on manpower, summaries of benefit costs for all employees, and sales incentive plans. The submitted manpower reports were broken down by facility and showed the functions at each facility and the people working within those functions. After review of these reports, Geourgoulis gave specific numbers for manpower reductions at all plants, and even went so far as to personally go through a list of employees at the Charles City plant inquiring whether each employee was necessary to the operations of the plant.[2]

The WFE Board of Directors, of which Geourgoulis was Chairman, made significant decisions affecting WFE and its employees. The defendants give a conclusory assertion that Geourgoulis did not take an active role on the Board, however, as one of only two Board members from December 1980 until March of 1983, Geourgoulis had to have concurred in the actions taken by the Board or the Board would have been deadlocked. During this time period the Board drastically changed the pension benefits of WFE's non-union employees and the insurance benefits of WFE retirees.

Geourgoulis attended and had final authority over WFE management meetings. When Geourgoulis was absent from these meetings, Robert Fuller, the president of WFE, would then confirm certain decisions with Geourgoulis at a later date.[3]

Geourgoulis made the decision to close the Syracuse and Dallas–Fort Worth operations of WFE and to consolidate these operations into other regions. Geourgoulis and Dean Marcy, along with Jim Slife, conducted the negotiations with BWAC for the refinancing of WFE's loans. The then president of WFE, Fuller, was not included or even consulted pursuant to the large scale refinancing of his company.

Geourgoulis oversaw the negotiations between the Charles City Plant Manager and WFE's insurance carrier regarding storm damage to the roof at the Charles City facility. While the face-to-face negotiations were ongoing, the plant manager would stop the negotiations in order to consult with Geourgoulis concerning how to conduct the negotiations and the amount to seek.

Due to Geourgoulis' authority to control WFE and his actual exercise of control over WFE, he is directly liable as an arranger under CERCLA. Finding direct liability, this court will not go on to consider whether Geourgoulis is also derivatively liable as an "arranger" by virtue of the common law theory of piercing the corporate veil.

### Liability of TICI and TICU

The Eighth Circuit has not addressed a case in which the parent corporation is being held liable for CERCLA violations. Courts which have addressed this issue have addressed it in respect to finding liability of the parent as an operator and not as an arranger. When assessing liability as an operator, courts have found that a parent corporation can be held both directly and derivatively liable under CERCLA. *CPC Intern., Inc. v. Aerojet–General, Inc.,* 777

---

**2.** Geourgoulis stated at deposition that he does not recall taking this action. However, Geourgoulis has never disputed that the event occurred.

**3.** Defendants assert that Geourgoulis was a mere advisor at WFE staff meetings, however, this is merely a conclusory statement with no supporting evidence and which is contradicted by the large amount of evidence produced by the plaintiffs in the way of depositions, written documents and affidavits that identify specific instances where Geourgoulis clearly took a larger role than that of an advisor.

F.Supp. 549, 572 (W.D.Mich.1991). Direct liability is appropriate where the parent has exerted actual control over the subsidiary inconsistent with its investment relationship. *Id,* at 573. Courts have found the parent directly liable as an operator only where the parent has exerted "actual control" over the activities of the subsidiary.

■ As was necessary in assessing the liability of a corporate officer for the actions or failure to act of the officer's corporation, something more needs to be shown than merely that the parent corporation had the authority to control the subsidiary. Because it is inherent to any parent-subsidiary relationship that the parent has the authority to control the actions of the subsidiary, *See United States v. Kayser–Roth Corp., Inc.,* 910 F.2d 24, 27 (1st Cir.1990), it would not be appropriate to hold a parent corporation liable for improper waste disposal of the subsidiary's waste where the parent took no active role in the subsidiary and was merely acting within the bounds of its investment relationship.[4]

■ This court finds it appropriate to use case law discussing parent corporation liability as an operator to determine liability as an arranger. Where as here, the question of liability concerns a corporation which is producing the hazardous waste and disposing of it off corporate property, this court finds that it would open a wide hole in CERCLA law should such a corporation be treated differently than a corporation which disposed of its hazardous waste on its own property. The use of the "actual control" test, to also assess arranger liability, ensures that a parent corporation who is active within certain areas of its subsidiary's activities is not encouraged to ignore the hazardous waste practices of the subsidiary.

■ Again there is a discrepancy among the courts as to how much actual authority must be shown before liability arises. *See Jacksonville Elec. Authority v. Bernuth Corp.,* 996 F.2d 1107, 1110 (11th Cir.1993) (the parent must have exerted actual and pervasive control over the subsidiary to the extent that it actually involved itself in daily operations of the subsidiary); *CPC Intern., Inc. v. Aerojet–General, Inc.,* 777 F.Supp. at 575 (liability arises if the parent exceeded the bounds of an interested investor and entered the realm of an active operator). This court holds that CERCLA policy dictates a finding of liability where the parent has gone beyond an investment relationship with the subsidiary and has exerted actual control over the subsidiary's activities.[5]

Whether the parent has exerted sufficient control over the subsidiary such that liability should attach is determined on a case-by-case basis according to the particular facts of the case at bar. A review of past court determinations as to whether sufficient control has been exerted is helpful in determining whether TICI and TICU have exerted sufficient control that liability may be assessed.

In *Kayser–Roth,* 910 F.2d 24, the parent corporation was found liable where the parent had total monetary control over the subsidiary, had placed restrictions on the subsidiary's budget, the subsidiary's governmental contacts and real estate transactions had to be funneled through the parent, expenditures greater than $5000 had to be approved by the parent, and almost all of the subsidiary's executive positions were filled by personnel of the parent.

In *Jacksonville Elec. Authority v. Bernuth Corp.,* 996 F.2d 1107, 1110 (11th Cir.1993), no liability was found where the parent's only involvement in the affairs of the subsidiary were the following: the parent had dictated

---

**4.** One court has asserted that courts have used an "authority to control test" to find parent corporation liability where the parent had the authority to control the activities of the subsidiary, but had not exercised that authority. *Lansford–Coaldale Water Authority v. Tonolli Corp.,* 4 F.3d 1209, 1221 (3rd Cir.1993). In a thorough search of case law, this court was unable to find a court that had utilized such a test for parent corporation liability.

**5.** An important reason for so holding is that the parent's exercise of authority in areas seemingly unrelated to waste disposal may directly affect the subsidiary's handling of its waste disposal problems. This is especially true if, the parent is making budgetary or cost cutting demands as the subsidiary may then feel compelled to attempt savings in the high cost area of hazardous waste disposal or may feel constrained from seeking an improved waste disposal system.

the terms of employment for officers of the subsidiary, the parent was the 100% owner of the subsidiary's stock, the parent had created a profit sharing plan for the subsidiary's executive officers, dividend distributions totaling more than the net earnings were made to the parent, the parent received status reports on the subsidiary's operations, and the parent hired the executive officers of the subsidiary.

In *CPC Intern., Inc. v. Aerojet–General, Inc.*, 777 F.Supp. at 575, the court found the parent liable where the evidence showed active participation and control by the parent in the subsidiary's affairs both internally through the subsidiary's board and externally through the actions of individual officers within the parent corporation. The court found the parent had full ownership of the subsidiary; active participation and sometimes control over the subsidiary's board which was an active decision-making body; the parent was involved in daily operations through parent officials who served in positions within the subsidiary (president and chief executive officer); there was active policy making and control by parent officials over the subsidiary's environmental matters and labor problems; and the parent exerted financial control over the subsidiary's budget and major capital expenditures.

In *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 407 (1st Cir.1993), the NEES Corp., a holding company, was found liable as an operator of its subsidiary utility companies where NEES had maintained a presence among the officers and directors of the subsidiary; the president of NEES was the president of the subsidiary, the president was appointed by the chairman of NEES and reported directly to NEES officials; NEES selected the directors of the subsidiary; a senior officer of NEES approved the subsidiary's budget and the subsidiary needed the approval of NEES to expend over $5000.

The service corporation which provided engineering and administrative services to NEES' holdings was also held liable as the court found the service corporation provided services such as controlling the checking account, handling the purchase of oil used in peak shaving, and maintaining the subsidiary's property, and employees of the service corporation were also represented among the subsidiary's officers and directors.

Finally, in *Lansford–Coaldale Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1223–24 (3rd Cir.1993), the appellate court refused to affirm the district court's decision that operator liability could not attach to the parent as the district court had failed to rule on several areas the appeals court felt were important to the determination of control. The appeals court found it significant that the companies shared common officers—president and chief financial officer—with evidence having been presented that officers of both corporations reported to the shared president and that the president exerted final decision making authority over all facets of the two companies operations and management; and that it was not determined whether a shared employee was actually involved in hazardous waste decisions of the subsidiary.

 In the case at bar, there is a great deal of evidence to show active parent corporation involvement in the affairs of WFE. All of Geourgoulis' involvement in WFE outlined above is applicable to determining parent corporation involvement as Geourgoulis was president and chairman of the board of directors for both TICI and TICU. The defendants themselves have acknowledged that TICI and TICU were involved in lowering labor and personnel costs at WFE.[6] Further, the evidence submitted shows that Geourgoulis maintained final authority over the areas of manpower and staffing at WFE.[7]

---

6. Defendants assert that TICI and TICU participated in these areas of WFE because of requirements the Bankruptcy Court made when TICI purchased WFE while in bankruptcy. However, CERCLA is a strict liability act allowing only statutorily constructed defenses.

7. Defendants dispute Robert Fuller's statement that the TIC corporations had final authority

over manpower and staffing decisions by showing that Fuller personally focused on cost-cutting measures at WFE including the areas of staffing and manpower. However, this does not contradict Fuller's statement that TICI and TICU maintained the final say over these matters and that TICI and TICU officials took their own initiative in these areas.

TICI and TICU, through various holding companies, owned 100% of WFE stock. From the acquisition of WFE until May 1983, parent corporation officials, Geourgoulis and Dean Marcy were the only individuals on WFE's Board of Directors. The Board was an active decision-making body, participating in WFE's labor matters, staffing, non-union employee benefit levels, pension plans and retiree insurance plans. Parent corporation officials, Geourgoulis and Marcy, negotiated the loan agreement with BWAC to refinance WFE and the $15 million loan was guaranteed by another TIC holding company, White Farms U.S.A.

There was also an overlap in several of the offices of WFE and various TIC holding companies. Marc Silverstein served as Secretary and General Counsel for each corporation listed from 1982 through 1984, Dean Marcy acted as Senior Vice President for each company during this same time period and Geourgoulis was president of WFE from December 1980 through November 1981.

Geourgoulis created the Office of Administrative Affairs within TICI and placed it under the direction of TIC Services employee, Emerson Barrett, Vice-president of Administration. Barrett was responsible for the oversight of the following functional areas within each TICI subsidiary: Personnel Administration, Industrial Relations, Industrial Safety, Employee Benefits, Office Services, Non-financial Government relations, and External Public Relations. All employees at WFE which had assigned responsibilities in any of the these areas were subordinate to Barrett. All changes in job status or compensation of these employees required Barrett's approval. The Office of Administrative Affairs was also given the authority to promulgate reporting requirements and to "issue such policy as may be needed to assure orderly and economic business conduct in the functional areas specified."

Financial arrangements between the TIC corporations and WFE were not handled at arms length. The president of WFE was not involved or consulted as to the refinancing of WFE. The refinancing was handled by Geourgoulis, Marcy and Slife and involved a guarantee by White Farms U.S.A. Further, the corporate fee TIC Services charged WFE for corporate services bore no relation to the formula which the defendants themselves assert is normally used to determine how much each subsidiary is required to pay for the services it receives from its parent. The undisputed fact that TIC Services had arranged to charge WFE an extra 40% for corporate services as profit to TIC Services until BWAC insisted that limitations on the corporate charge be imposed further shows that this charge had no relation to the actual market value of the services provided. TICI and TICU also filed consolidated tax returns for the period December 1981 through December 1985 which included WFE's finances.

 Due to the level of active involvement of TICI and TICU in the affairs of WFE, this court finds that each is directly liable as an arranger concerning the disposal of WFE's hazardous waste at the dumpsite owned by H.E. Construction.[8]

Accordingly, **It Is Ordered:**

1. Allied Product Corporation's Motion for Summary Judgment as to each defendant's direct liability under § 107(a)(2) of CERCLA is denied, it is granted as to each defendant's direct liability under § 107(a)(3) of CERCLA, and the court declines to consider the defendants derivative liability under § 107(a)(3) of CERCLA.

2. The court declines to consider the United States' Motion for Summary Judgement as to each defendants' derivative liability under § 107(a)(3) of CERCLA on the theory of piercing the corporate veil. The United States is free to submit a summary

---

8. This court would also find liability of all defendants under the alternative theory of "arranger" liability which finds a person liable if there is a sufficient nexus between the defendant and the complained of hazardous substance. *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2nd Cir.1992). Liability is found under this theory not only where the defendant was actively involved in decisions regarding hazardous waste disposal, but also where the defendant was obligated to control the hazardous substances. *United States v. Fleet Factors Corp.*, 821 F.Supp. 707, 724 (S.D.Ga.1993). This court believes that the defendants' extensive involvement in WFE obligated them to oversee WFE's waste disposal practices.

judgment motion regarding defendants' direct liability under § 107(a)(3) of CERCLA as the United States did plead this theory of liability in its complaint.

3. The defendants' Motion for Summary Judgment is denied as to defendants' liability under § 107(a)(2) of CERCLA and as to direct liability under § 107(a)(3) of CERCLA.

Done and so ordered.