Opinion issued March 27, 2003








     






In The
Court of Appeals
For The
First District of Texas




NO. 01-01-00299-CR
NO. 01-01-00300-CR




L.B. FOSTER COMPANY, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 228th District Court 
Harris County, Texas
Trial Court Cause Nos. 850910 and 850911




O P I N I O N

          In two separate indictments, appellant, L. B. Foster Company, was charged
with the offenses of illegal disposal of used oil


 and illegal disposal of a hazardous
waste.


 See Tex. Water Code Ann. §§ 7.162, 7.176 (Vernon 2000). A jury found
L.B. Foster guilty as charged in both indictments and assessed punishment at $20,000
for the used oil offense and $150,000 for the hazardous waste offense.
          In 11 issues, L.B. Foster contends that the evidence was legally and factually
insufficient to support either conviction, challenges omissions from and inclusions
in the jury charges, and complains that the indictment for the used oil charge was
jurisdictionally defective.
          We reverse and render a judgment of acquittal in the hazardous waste case and
affirm the judgment in the used oil case.
FACTUAL BACKGROUND
          On December 30, 1997, Houston Police Officer R.T. Hatcher and his partner,
M.W. Sallee, conducted a follow-up investigation to determine whether the
Burlington Northern Railway had addressed previously identified municipal code
violations along the railroad’s right-of-way, which bordered a public Houston street. 
From the street, Officer Hatcher noticed a rail spur that ran to what he thought was
a rail yard approximately 200 yards away. Officer Hatcher observed a pile of wood
cross-ties and metal track rails in the yard. Believing that the pile of debris belonged
to the railroad, which had been warned to clean-up the area, Officer Hatcher and his
partner drove to the property he had observed from the street. Once on the property,
Officer Hatcher noticed what he termed as “serious violations of the municipal
code.”


 Specifically, Officer Hatcher observed high grass, “jumbled piles of
material,” derelict vehicles, and stagnant water, which provide breeding areas for
rodents and mosquitos. 
          After observing the code violations, Officer Hatcher and his partner drove
toward the office buildings on the property. Officer Hatcher discovered that the
property was not a rail yard; rather, it was the property of L.B. Foster. As they were
driving on the property, they met Bryan Causey, an employee of L.B. Foster. Causey
identified himself as “the man in charge of the property.” When Officer Hatcher
asked him about the pile of cross-ties and rail lines, Causey explained that L.B. Foster
cut rail for the railroads.
          Located on L.B. Foster’s property were numerous metal buildings of various
shapes and sizes. Officer Hatcher noticed what appeared to be oil on the ground
under “hydraulic roller machines” located outside of the buildings. Officer Hatcher
saw that the soil under the machines appeared blackened, and, that puddles of water,
which had accumulated from a recent rain, appeared to contain oil. On the bottom of
a few of the metal buildings, Officer Hatcher could see “oily material.” It appeared
to Officer Hatcher that oil had run in or out of the buildings.
          Officer Hatcher issued a warning notice to Causey listing six violations of
municipal ordinances. Illegal dumping of oil was not listed in the notice. Officer
Hatcher also gave Causey a document entitled “Common Violations of City of
Houston Municipal Ordinance.” The preprinted document listed 57 possible
municipal code violations. Of these possible violations, Officer Hatcher circled 21
items, including the following: “Permit the deposit of offensive matter hazardous to
public health, i.e., used motor oil.” Officer Hatcher also verbally mentioned the oil
contamination to Causey. Officer Hatcher specifically pointed out the staining on the
bottom of the buildings. Causey acknowledged that he was aware of the oil problem
and told Officer Hatcher, “I’ll take care of it.” Officer Hatcher indicated to Causey
that he would return on February 5, 1998, to determine whether the noted violations
had been corrected. 
          When he returned to L.B. Foster’s property on February 17, 1998, Officer
Hatcher found that none of the cited violations had been corrected. L.B. Foster had
taken no action to clean-up the oil contamination that Officer Hatcher had cited on
his previous visit. Officers Hatcher and Sallee took several photographs related to
the oil contamination and informed Causey they would return the next day with other
police officers. 
          At trial, in explaining various pictures, Officer Hatcher commented on the
following: several buckets of black sludge tipped over on the ground near a fueling
station; what appeared to be oil inside the sewer and stained soil with an oily
substance flowing toward the storm drain, and dark staining on the ground around a
pick-up truck and an oil bucket of the type used to change oil. With regard to the oil
bucket, Officer Hatcher testified that it “looked like somebody changed the oil on a
vehicle, threw the oil here and here on the ground.”
          The following day, on February 18, 1998, Officer Hatcher and his partner
returned to L.B. Foster’s property with Officer Stephen Dicker, who worked for the
Houston Police Department’s environmental crimes unit. Also present were two fire
marshal inspectors. The police officers discussed the violations with Causey and
other L.B. Foster representatives. The police officers and company officials also
toured the property. Officers Hatcher and Sallee issued 19 citations to Causey for
municipal code violations. None of the citations were for improper disposal of used
oil or hazardous waste.
          The officers also took additional photographs of the oil contamination on
February 18. Generally, the photographs show dark staining under hydraulicly-operated machines and pipe storage racks, black substance on the walls of the
buildings, and oil-like stains on the ground, grass, and floors of the facility. Officer
Dicker observed pistons and hydraulic hoses on the machinery actively leaking oil-like substances onto the ground in all operating areas of the property, and buckets of
hydrocarbon fluids being stored without being sealed. He observed that the buckets
had either leaked or spilled. He also observed “a lot of” stained soil underneath the
areas where hoses had been disconnected and a pool of standing hydrocarbon liquid
in the area. 
          Officer Dicker discussed with L.B. Foster officials the cause of the oil
contamination, namely, the cutting and threading of pipe on the property. In addition
to leaking hoses and pistons, another possible source of the contamination discussed
was hydrocarbon-based coatings and coolants that L.B. Foster applied to pipes during
the threading and cutting processes, which were allowed to run off onto the ground.
          The officers also photographed a large metal container located west of
“Building 5” on the property. The top was off the container and it had a foul,
chemical odor. The container was not actively leaking during the officers’ visits; but,
from the tan-colored material present on its sides, it appeared that the container had
overflowed or spilled at some earlier time. The ground near the container was a
lighter color, further indicating that material from the container had spilled onto the
ground. 
          Inspector Don Montgomery, an environmental investigator with the City of
Houston, was also present at the facility on February 18. Inspector Montgomery
collected six soil samples from different locations on L.B. Foster’s property. Five of
these samples were collected from areas of suspected oil contamination. Elevated
levels of total petroleum hydrocarbons and the presence of certain heavy metals
indicated that the soil in each of the five samples was contaminated with used oil. 
          Inspector Montgomery also collected a soil sample from near the metal
container located west of Building 5. Inspector Montgomery collected the sample
because he was concerned that the waste in the container, which appeared to have
flowed onto the ground, was a type of paint-waste. Inspector Montgomery knew that
most paint-wastes contain a high concentration of lead. When analyzed, the soil
sample revealed hazardous levels of lead, approximately 12 times the level
considered hazardous by the Environmental Protection Agency. Although L.B.
Foster later disposed of it as a hazardous waste, the investigators never took a sample
of the material in the container to determine its properties. 
          On February 19, 1998, L.B. Foster retained T-2 Environmental, an
environmental consulting firm, to assist with the clean-up efforts on its property. For
the remainder of 1998 through the first quarter of 1999, Robert Finkelstein of T-2
Environmental supervised the remediation of the property, including the removal of
71 tons of lead-contaminated soil and 2916 cubic yards of hydrocarbon-contaminated
soil. By the conclusion of the remediation, L.B. Foster had spent approximately
$610,000 to clean-up its property.
          Finklestein completed a site remediation report in April 1999. The following
information contained in the report is of particular relevance to this case:
This report documents the results of site remediation actions recently
undertaken at the L.B. Foster Company property located at 6500
Langfied Road in Houston, Texas. . . .
 
L.B. Foster Company and its predecessors have operated a pipe
storage and distribution business at this location since acquiring the
property in 1969. The L.B. Foster Company provides pipe for municipal
and industrial customers and rail for the railroads. With the exception
of the acquisition of new and faster threading machines in 1981, the
manufacturing operations have remained essentially unchanged
throughout the operating life of the facility.
 
The pipe processing operations include cutting, grinding,
threading, upsetting, and coupling of pipe according to customer-specified needs. The rail fabrication operations include rail punching
and cutting to railroad specifications. Supporting operations include
product-specific cleaning and coating operations, primarily involving
the application of coatings and thread protectors as required to prevent
product damage while in outdoor storage.
 
The southwest area of the property is where fabrication occurs. 
This area is easily identified on the property plot plan since it contains
the buildings housing the fabrication machinery. Areas in this part of
the property are those where the site remediation actions documented
herein were undertaken. Approximately 1/3 of the 129-acre property
has been used for the outdoor storage and warehousing of raw materials
and finished goods. Another 1/3 of the property has never been use for
any industrial purpose.
 
. . . .
 
The areas at which soil remediation actions were undertaken are
soil surfaces impacted by chronic leaks and spills of hydrocarbon
substances occurring during the course of the normal industrial
operations and throughout the facility’s nearly 30-year operating life.
 
The hydrocarbon substances primarily include oils, coolants,
hydraulic fluids, and fuels leaked or spilled from equipment and
machinery or while fueling vehicles used on-site (i.e., fork lifts, petti-bones, backhoe, etc.). The hydrocarbon substances also include rust
prevention coatings and lubricants applied to pipe threads for
protections from corrosion while in outdoor storage. These sources are
associated with the industrial operations and equipment and the
impacted soil areas are those in the vicinity of the buildings housing the
fabrication equipment and operations.

          On July 24, 2000, the State indicted L.B. Foster for two offenses: (1)
knowingly disposing of used oil on its land and (2) knowingly and intentionally
disposing of a hazardous waste, namely a solid waste exhibiting the toxicity
characteristic for lead, without the required permits. The State later amended the
indictment in the hazardous waste case to drop the “intentionally” allegation. Bryan
Causey was also indicted on the same charges but was granted a directed verdict
following the close of the defense’s case-in-chief. The jury found L.B. Foster guilty
of both charges. After the trial court denied L.B. Foster’s motion for new trial, these
appeals followed.
DISCUSSION
A.      Legal Sufficiency of Evidence for the Hazardous Waste Conviction 
          In issue one, L.B. Foster challenges the legal sufficiency of the evidence to
establish that it knowingly disposed of a hazardous waste within the applicable statute
of limitations period. 
 
          1.       Standard of Review
          When reviewing the legal sufficiency of the evidence, we view the evidence
in the light most favorable to the verdict and determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In conducting this
analysis, we may not re-weigh the evidence and substitute our judgment for that of
the jury. Id. The standard is the same for both direct and circumstantial evidence
cases. Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999). Sufficiency
of the evidence is measured by the hypothetically correct jury charge, which
accurately sets out the law, is authorized by the indictment, and does not
unnecessarily increase the State’s burden of proof. Malik v. State, 953 S.W.2d 234,
240 (Tex. Crim. App. 1997). 
          2.       Analysis
          The offense of knowingly disposing of a hazardous waste, as charged in this
case, is found in Water Code subsection 7.162(a)(2), as follows:
(a) A person commits an offense if the person, acting intentionally or
knowingly with respect to the person’s conduct:
 
. . . .
 
(2) stores, processes, exports, or disposes of, or causes to be stored,
processed, exported, or disposed of, any hazardous waste without all
permits required by the appropriate regulatory agency . . . .

Tex. Water Code Ann. § 7.162(a)(2) (Vernon 2000). As a felony offense, a three-year statute of limitations applies to a charge under subsection 7.162(a)(2). See Tex.
Code Crim. Proc. Ann. art. 12.01(6) (Vernon Supp. 2003); see also Water Code
Ann. §§ 7.162(b), 7.187(2)(G) (Vernon 2000). The indictment in the hazardous
waste case alleged that L.B. Foster knowingly disposed of a hazardous waste “on or
about February 18, 2000.” The “on or about” language in an indictment provides that
the State may prove a date other than the date alleged, as long as the date is before the
presentment of the indictment and it is within the applicable statute of limitations. 
See Sledge v. State, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). Because the
indictment in the hazardous waste case was presented on July 24, 2000, the State was
required to show that L.B. Foster committed the offense of knowingly disposing of
a hazardous waste in violation of Water Code subsection 7.162(a)(2) on or after July
24, 1997. See Tex. Code Crim. Proc. Ann. art. 12.01(6).
          If a defendant requests a jury instruction on its limitations defense, and there
is some evidence that prosecution is time-barred, the State must then prove beyond
reasonable doubt that prosecution is not limitations-barred. Proctor v. State, 967
S.W.2d 840, 844 (Tex. Crim. App. 1998). Here, L.B. Foster requested a limitations
instruction; the trial court charged the jury as follows:
This case was indicted on July 24, 2000. Thus, the State must prove
beyond a reasonable doubt that the alleged offense occurred on or after
July 24, 1997. If you find that State has failed to so prove, you should
acquit the defendant on that basis alone.
We now turn to the evidence to determine whether it was legally sufficient to show
that L.B. Foster knowingly discharged a hazardous waste on or after July 27, 1997.
                    a.       Circumstantial Evidence
          The State maintains that the source of the lead contamination was the metal
container located near Building 5, which Inspector Montgomery suspected contained
paint-waste. Testimony was elicited at trial that the container was not actively
leaking on February 18, 1998, when the Houston Police officers were investigating
L.B. Foster’s facility. On appeal, the State contends sufficient circumstantial
evidence existed to allow the jury to reasonably infer that L.B. Foster’s personnel
knowingly caused the waste in the metal container to overflow onto the ground within
the limitations period either by overfilling it or by failing to empty it in a proper
manner. In support of its contention, the State cites to evidence in the record that
suggests the metal container held some type of paint-waste, the waste contained lead,
the waste in the container either overflowed or had some type of spillage associated
with its being emptied or filled, and the waste spillage resulted in the soil near the
container becoming contaminated with lead. Though such evidence may be sufficient
to suggest a disposal of a hazardous waste, it is not probative by itself of the date of
the alleged disposal. 
          The State also relies on evidence indicating that the area where the container
was located was in “active use” by L.B. Foster during the limitations period. The
State cites to the testimony of Steve Hart, L.B. Foster’s vice-president of operations,
who, in describing a map of L.B. Foster’s 130-acre property, stated that the southern
half of the property “predominantly has been used” while the northern portion was
used infrequently. However, no evidence was introduced to show that the area of the
lead contamination was used only during the limitations period, i.e., between July 24,
1997 and July 24, 2000. To the contrary, when read in context, Hart’s testimony
indicated that predominantly the southern half of the property had been used during
the entire course of L.B. Foster’s 30-year operating history. Thus, Hart’s testimony
on this point does not support an inference that a disposal of hazardous lead-containing waste necessarily occurred within the limitations period.
          The State also introduced two photographs of the metal container taken by
Officer Dicker on February 18, 1998. The photographs show tan, paint-like material
on the side of the container flowing in a downward pattern. Although it was not
readily apparent from the photographs, Officer Dicker and Inspector Montgomery
each testified that the ground near the container, where the soil sample was taken, was
discolored. According to Inspector Montgomery, the waste was not only on the side
of the container, but also on the ground near the container. Officer Dicker stated that
the soil near Building 5, where the container was located, was a “lighter tan color,”
which appeared to be a “paint-type material or coating-type material.” 
          In its brief, the State contends that, based on this evidence, the jury could “have
rejected as unreasonable the claim that the hazardous waste spillage in an active
portion of the property had occurred prior to the limitations period and had thereafter
stayed pristine and untroubled until discovered by Office Hatcher on February 18,
1998.” As stated above, the State had the burden to show beyond a reasonable doubt
that L.B. Foster knowingly disposed of a hazardous waste within the limitations
period. The police officers’ February 18 visit came only eight months after the start
of the limitations period, i.e., July 24, 1997. Without more, the presence of paint-waste on the side of the container and on the ground does not create a reasonable
inference that the alleged disposal necessarily occurred within the limitations period. 
Beyond its mere existence, no evidence was offered to corroborate the State’s theory
that the paint-waste was spilled on or after July 24, 1997. To the contrary, a
reasonable inference can be drawn that, by its very nature, paint-waste would not
disappear readily and could potentially remain on the container and ground for a
period beyond eight months. Thus, evidence of the presence of paint-waste on the
outside of the container and on the ground, without more, is legally insufficient to
establish that L.B. Foster disposed of the alleged paint-waste within the limitations
period. 
          Viewing the circumstantial evidence in the light most favorable to the verdict,
we conclude that a rational trier of fact could not have found beyond a reasonable
doubt that L.B. Foster disposed of a hazardous waste during the applicable limitations
period.
                    b.       Passive Migration
          As an alternative theory, the State contends the evidence was legally sufficient
to support the jury’s implicit finding that the State proved L.B. Foster knowingly
disposed of a hazardous waste within the limitations period because, until the
property was remediated, L.B. Foster allowed hazardous waste to “passively” (i.e.,
without human conduct) migrate through the soil by way of natural forces such as
rainwater, groundwater, and gravity. The State argues that L.B. Foster continued to
(passively) dispose of hazardous waste until February 18, 1998, the date alleged in
the indictment, which is well within the limitations period. In addition to promoting
the theory on appeal, the State relied on the concept of passive disposal of hazardous
waste at trial; the State informed the jury that, under the law, L.B. Foster committed
a new and continuing offense each day the hazardous waste migrated through the
ground. 
          As set out above, subsection 7.162(a)(2) provides that a person commits an
offense if the person, acting intentionally or knowingly with respect to the person’s
conduct, disposes of, or causes to be disposed of, any hazardous waste without all
permits required by the appropriate regulatory agency. Tex. Water Code Ann. §
7.162(a)(2). To determine whether L.B. Foster can be held criminally liable for a
passive disposal, we must determine whether the meaning of “disposed of,” as found
in Water Code subsection 7.162(a)(2), includes the concept of passive disposal, or
whether “disposed of” requires active human conduct. This is an issue of first
impression in this State.
          We begin our statutory analysis by recognizing that the Water Code has its own
provision relating to the construction of its provisions. Water Code subsection
1.002(a), entitled “Construction of Code,” provides as follows: “The Code
Construction Act (Chapter 311, Government Code) applies to the construction of each
provision in this code, except as otherwise expressly provided by this code.” Tex.
Water Code Ann. § 1.002(a) (Vernon 2000). This poses a potential conflict with
the leading case on statutory construction from the Court of Criminal Appeals, Boykin
v. State, 818 S.W.2d 782, 786 (Tex. Crim. App. 1991). Boykin established that the
“plain language” approach to statutory construction must be employed, limiting
interpretation to the express text of statute unless it is ambiguous or such a
construction leads to an absurd result. Id. 
          The Code Construction Act allows consideration of extra-textual factors
without requiring ambiguity in the text of the statute. See Tex. Gov’t Code Ann.
§ 311.023 (Vernon 1998) (listing extra-textual factors). However, a conflict with
Boykin is avoided by referencing Lanford v. Fourteenth Court of Appeals, in which
the Court of Criminal Appeals carved out an exception to its Boykin rule by
concluding that an ambiguity exists when the parties take polarized positions
regarding the interpretation of a statute’s text. Lanford, 847 S.W.2d 581, 587 (Tex.
Crim. App. 1993); see also Allen v. State, 11 S.W.3d 474, 476 (Tex. App.—Houston
[1st Dist.] 2000), affirmed, 48 S.W.3d 775 (Tex. Crim. App. 2001). Because the
parties here take polarized positions as to whether “disposal” includes the concept of
“passive disposal,” it is appropriate to apply the Code Construction Act, where
necessary, in resolving this issue.
          The Water Code does not define the phrase “disposed of.” Generally,
undefined words in statutes are given their plain meaning unless the statute clearly
shows that they were used in another sense. See Daniels v. State, 754 S.W.2d 214,
219 (Tex. Crim. App. 1988); Weyandt v. State, 35 S.W.3d 144, 155 (Tex.
App.—Houston [14th Dist.] 2000, no pet.). And statutory words are to be read in
context and construed according to the rules of grammar and common usage. 
Weyandt, 35 S.W.3d at 155. However, the canons of construction dictate that words
and phrases possessing a technical meaning are generally to be considered as having
been used in their technical sense. Medford v. State, 13 S.W.3d 769, 772 (Tex. Crim.
App. 2000) (citing 82 C.J.S. Statutes § 330 (1953)); see also Tex. Gov’t Code Ann.
§ 311.011(b) (Vernon 1998) (providing that “Words and phrases that have acquired
a technical or particular meaning, whether by legislative definition or otherwise, shall
be construed accordingly.”). Within the context of environmental statutes governing
hazardous waste management, “disposal,” which is the nominal form of “to dispose,”
has been defined to have a particular, technical meaning. 
          The Code Construction Act permits us to construe a provision in light of
existing statutes covering the same or similar subjects. Tex. Gov’t Code Ann. §
311.023(4). The Texas Solid Waste Disposal Act (TSWDA)


 defines “disposal” as
follows:
‘Disposal’ means the discharging, depositing, injecting, dumping,
spilling, leaking, or placing of solid waste or hazardous waste, whether
containerized or uncontainerized, into or on land or water so that the
solid waste or hazardous waste or any constituent thereof may be
emitted into the air, discharged into surface water or groundwater, or
introduced into the environment in any other manner. 

Tex. Health & Safety Code Ann. § 361.003(7) (Vernon 2001). Here, the trial
court defined “disposal” for the jury in accordance with this statutory definition.


 
          In construing a statute, a court may consider former statutory provisions. See
Tex. Gov’t Code Ann. § 311.023(4). Here, considering the former statutory
versions of Water Code subsection 7.162(a)(2) is illuminating. The current language
of Water Code subsection 7.162(a)(2) was at one time found verbatim in subsection
361.221(2) of TSWDA.


 In 1997, the Legislature repealed section 361.221 and
recodified it in Chapter 7 of the Water Code.


 The definition of “disposal” found in
TSWDA has remained unchanged since enactment in 1989.


 Significantly, from 1991
until 1997, the definition of disposal currently found in TSWDA coexisted in that act
with the now-repealed section 361.221. Thus, for six years, “disposal,” within the
context of an illegal disposal of a hazardous waste, had the meaning currently
provided by subsection 361.003(7) of TSWDA. 
          Moreover, federal environmental statutes provide definitions for “disposal”
nearly identical to that found in subsection 361.003(7). The Comprehensive
Environmental Response, Compensation and Liability Act of 1980 (CERCLA)
defines “disposal” by referencing the definition of “disposal” found in the Resource
Conservation and Recovery Act (RCRA), see 42 U.S.C. § 9601(29), which in turn
defines “disposal” as follows: 
The term “disposal” means the discharge, deposit, injection, dumping,
spilling, leaking, or placing of any solid waste or hazardous waste into
or on any land or water so that such solid waste or hazardous waste or
any constituent thereof may enter the environment or be emitted into the
air or discharged into any waters, including ground waters. 
42 U.S.C. 6903(3). 
          Applying the relevant rules of construction, we conclude that the definition of
“disposal” found in TSWDA subsection 361.003(7) is the appropriate definition for
determining what constitutes an illegal disposal of a hazardous waste under Water
Code subsection 7.162(a)(2). However, this does not end our inquiry; we are still left
to determine whether, under that definition, a passive migration of hazardous waste
through the soil, unaffected by affirmative human agency, constitutes a disposal for
purposes of criminal liability under Water Code subsection 7.162(a)(2).
          We begin by noting that the definition of disposal found in TSWDA subsection
361.003(7) is defined primarily in terms of active verbs such as “discharging,”
“depositing,” “injecting,” “spilling,” “dumping,”and “placing.” Implicit in the
common meanings of all of these acts is that they are set in motion by affirmative
human conduct, whether purposeful or not. Though “leaking” may occur without
human action, it does not describe passive migration of hazardous waste through the
soil. See Webster’s New Collegiate Dictionary 648, (1981) (defining “leak” as,
inter alia, “to enter or escape through an opening . . . .” One would never properly
say that a hazardous waste is “leaking” through the soil. Rather, a hazardous waste
leaks from some form of containment.
          The State accurately points out that “discharging” is listed as a means of
disposal in TSWDA’s definition. Citing to chapter 26 of the Water Code, the State
contends that the following definition should be applied to “discharge”:
“To discharge” includes to deposit, conduct, drain, emit, throw, run,
allow to seep, or otherwise release or dispose of, or to allow, permit, or
suffer any of these acts or omissions.




Tex. Water Code Ann. § 26.001(19) (Vernon 2000). Seizing upon the “allow to
seep” portion of the definition, the State argues as follows: “A plain reading of this
statutory definition indicates that the Legislature specifically made it a violation of
the statute if a person fails to address, contain and remediate a source of
contamination that, if not addressed, may seep and spread.” 
          Chapter 26 of the Water Code pertains to water quality control. See Tex.
Water Code Ann. §§ 26.001–.460 (Vernon 2000). Thus, the “to discharge”
definition refers to a discharge relating to water; not a discharge of hazardous waste
onto land. Without an indication of legislative intent, we are hesitant to apply a
definition from a section of the Water Code that bears no relation to the facts of this
case. Cf. Tex. Gov’t Code Ann. § 311.023(4) (stating courts may consider laws on
same or similar subjects). The evidence showed that groundwater was not impacted
by the contamination in this case. It is also noteworthy that the above-definition of
“to discharge” includes the definitional phrase “dispose of.” Thus, under this
definition, “to discharge” means to “dispose of,” which is the very phrase we seek to
interpret. The application of such a circular definition would be unavailing. 
          We must also view the phrase “disposed of” in the context of Water Code
subsection 7.162(a)(2). When interpreting statutes, we seek always to effectuate the
collective legislative intent or purpose. Sanchez v. State, 23 S.W.3d 30, 34 (Tex.
Crim. App. 2000). Appellate courts must give effect to the whole statute, not
interpreting any phrase in isolation, but looking at the phrase in situ, or in the context
of the entire statute in question. Nguyen v. State, 1 S.W.3d 694, 696 (Tex. Crim. App.
1999). As already mentioned, subsection 7.162(a)(2) states, in relevant part, “A
person commits an offense if the person, acting intentionally or knowingly with 
respect to the person’s conduct . . . . disposes of . . . or causes to be . . . disposed of,
any hazardous waste without all permits required . . . .” Tex. Water Code Ann. §
7.162(a)(2) (emphasis added). Although we recognize that “conduct” is defined in
the Penal Code as an act or omission with the accompanying mental state,


 the
offense set forth in Water Code subsection 7.162(a)(2) is one of commission, not
omission.


 Thus, reading “disposed of” in the context of subsection 7.162(a)(2)
shows a legislative intent to require affirmative human conduct. Such a reading
precludes interpreting “disposed of” to include passive disposal. 
          As mentioned above, whether a disposal for purposes of committing an offense
under subsection 7.162(a)(2) includes a “passive disposal” is a question of first
impression in Texas. We recognize, as cited by L.B. Foster, that numerous federal
courts have discussed whether the concept of “disposal” includes passive disposal
within the context of CERCLA cost-recovery and enforcement actions. Compare
Niagra Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 178 (2nd Cir. 2003)
(holding passive movement of contaminant from one property to another not a
CERCLA disposal) and Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863,
879 (9th Cir. 2001) (concluding gradual passive migration of contamination through
the soil was not “discharge, deposit, injection, dumping, spilling, leaking, or placing”
and, therefore, was not a CERCLA “disposal”) with Nurad, Inc. v. William E. Hooper
& Sons Co., 966 F.2d 837, 846 (4th Cir.1992) (holding past owners liable for the
“disposal” of hazardous wastes that leaked from an underground storage tank).
          We also recognize that, when the Texas Legislature adopts a statute with
wording substantially similar to a federal statute, we presume, absent some indication
to the contrary, that the legislature intended to adopt the construction placed on that
wording by the federal courts, and we look to federal cases as a guide in interpreting
the state statute. See R.R. Street & Co., Inc. v. Pilgrim Enters., Inc., 81 S.W.3d 276,
290 (Tex. App.—Houston [1st Dist.] 2001, pet. filed) (finding federal case-law
interpreting arranger liability under CERCLA instructive in determining arranger
liability under TSWDA because applicable language of two statutes similar). 
Although TSWDA’s definition of disposal is substantially similar to that of
CERCLA, we find the federal CERCLA cases provide minimal assistance in
determining whether a passive disposal can form the basis for criminal liability under
Water Code subsection 7.162(a)(2). CERCLA cases discussing the concept of
passive disposal involve the civil liability of the suspected polluter, while we are
charged with determining whether a passive disposal of hazardous waste can support
a criminal conviction. CERCLA is a strict-liability statute, while criminal liability
under Water Code section 7.162 requires an intentional or knowing mental state. 
Significantly, none of the CERCLA cases discussing passive disposal do so in
conjunction with a statute of limitations issue.
          We have found only one case in any jurisdiction involving a criminal
conviction based on the passive disposal of a hazardous waste. In People v. Thoro
Prods. Co., two criminal defendants were convicted for the passive disposal of
hazardous waste under the Colorado Hazardous Waste Act, which contains a
definition of disposal substantially similar to the one found in TSWDA. 45 P.3d 737,
740 (Colo App. Ct. 2001). In Thoro Products, the Colorado Court of Appeals
vacated the convictions on the basis that to allow a conviction founded on the passive
disposal of hazardous waste would render the applicable statute of limitations
meaningless. Id. at 742. On this point, the Thoro Products court stated as follows: 
Looking to the statutory scheme as a whole, we observe that to construe
“disposal” in the manner suggested by the People would, for all practical
purposes, make the statute of limitation here a nullity. That is, if we
interpret “disposal” here as an act that endures until hazardous wastes
no longer percolate through or exist in soil or water, then disposal
effectively continues until the substance dissipates to the point where it
is no longer hazardous, possibly eons later, or until remediation occurs.
Under this interpretation, the limitation period would begin only at this
possibly remote moment in time, a time that, in all probability, could
seldom, if ever, conclusively be pinpointed. In our view, the General
Assembly did not intend such a result, because it would go against the
very purpose for which statutes of limitation are enacted, i.e., to protect
individuals from having to defend themselves against stale criminal
charges and to prevent punishment for acts committed in the remote
past. 
Id. (internal citations omitted). We find the reasoning of the Colorado Court of
Criminal Appeals persuasive. We agree that interpreting disposal to include the
passive migration of hazardous waste through the soil eviscerates the applicable
statute of limitations and forces defendants to defend themselves against stale claims
that occurred in the remote past. See id. Certainly, such could not have been the
intent of the Legislature when it enacted Water Code section 7.162.
          We conclude that, for purposes of criminal prosecutions under Water Code
subsection 7.162(a)(2), the term “disposal” does not include the passive disposal of
hazardous wastes. In other words, a “disposal” of hazardous waste under section
7.162 requires more than the passive migration of waste through the soil unaided by
affirmative human conduct. Some form of affirmative human conduct must
accompany a disposal for it to rise to the level of criminal culpability. 
                    c.       Continuing Offense 
          As a corollary to the passive disposal theory, the State asserts that, each day it
failed to remediate its property, L.B. Foster committed a continuing offense under
Water Code subsection 7.162(a)(2). In support of this point, the State relies on Water
Code section 7.186. However, the express language of section 7.186 negates the
State’s position. That section provides as follows: “Each day that a person engages
in conduct proscribed by this subchapter constitutes a separate offense.” Tex.
Water Code Ann. § 7.186 (Vernon 2000) (emphasis added). Under the express
language of section 7.186, each day that a person illegally disposes of a hazardous
waste is a separate offense, not a continuing offense. Because the Legislature has
expressly stated its intent that the criminal, environmental offenses enumerated in
Subchapter E, Chapter 7 of the Water Code be prosecuted as separate rather than
continuing offenses, we cannot hold otherwise. 
          Moreover, regardless of whether the knowing disposal of a hazardous waste
without the requisite permits is a continuing offense or not, the State’s prosecution
in this case was nonetheless time-barred. We have interpreted the phrase “disposed
of” found in Water Code subsection 7.162(a)(2) to exclude the passive disposal of
hazardous waste. Here, the State failed to present legally sufficient evidence of a
“disposal” of a hazardous waste effectuated by affirmative human conduct within the
applicable limitations period. 
          We sustain L.B. Foster’s first issue presented and hold that the evidence was
legally insufficient to support the hazardous waste conviction. Because of our
disposition of issue one, we need not reach L.B. Foster’s second, third, or fourth
issues, which also challenge the hazardous waste conviction.
B.      Used Oil Offense
          In seven issues, L.B. Foster challenges the used oil conviction on the basis that
the indictment was jurisdictionally defective, the evidence was legally and factually
insufficient to support the conviction, and the trial court failed to properly instruct the
jury in the charge. 
          1.       Jurisdictional Defect
          In issue five, L.B. Foster contends that the indictment charging the used oil
offense is jurisdictionally defective because corporations cannot be prosecuted under
the applicable statute—Water Code subsection 7.176(a)(2). That subsection provides
“a person commits an offense if the person . . . knowingly . . . directly disposes of
used oil on land.” Tex. Water Code Ann. § 7.176(a)(2) (Vernon 2000) (emphasis
added). L.B. Foster maintains that prosecutions under subsection 7.176(a)(2) are
limited to individual persons and that the Legislature did not intend to include
corporations within the definition of “person” under this subsection. 
          To determine whether the indictment was jurisdictionally defective, we must
determine whether the term “person” in Water Code section 7.176 includes
corporations. Subsection 1.07(38) of the Penal Code defines “person” as “an
individual, corporation, or association.” Tex. Penal Code Ann. § 1.07(38) (Vernon
2003). Subsection 1.07(38), which is in Title 1 of the Penal Code, is made applicable
to the offenses enumerated in the Water Code by Penal Code subsection 1.03(b),
which provides: “The provisions of Titles 1, 2, and 3 apply to offenses defined by
other laws, unless the statute defining the offense provides otherwise; . . . .” Tex.
Penal Code Ann. § 1.03(b) (Vernon 2003). Here, section 7.176 does not define
“person” or otherwise indicate that a corporation cannot be prosecuted for the illegal
disposal of used oil. Thus, under Penal Code subsections 1.03(b) and 1.07(38), L.B.
Foster is a “person” for purposes of prosecution under Water Code section 7.176.
          We continue our statutory analysis by noting that the Code Construction Act
includes “corporation” in its definition of a “person.” Tex. Gov’t Code Ann. §
311.005(2) (Vernon 1998). As previously cited, Water Code subsection 1.002(a)
states that the Code Construction Act applies to the construction of each provision of
the Water Code, except as otherwise expressly provided in the code. Here, the Water
Code does not indicate that the Code Construction Act should not be applied to assist
in interpreting section 7.176. And, because the parties take polarized positions
regarding whether a corporation is a “person” for purposes of prosecution under
section 7.176, we are free to apply the definition of “person” found in the Code
Construction Act. See Allen, 11 S.W.3d at 476. 
          Whether construed according to the applicable provisions of the Penal Code
or the Code Construction Act, we find a legislative intent to define “person” to
include corporations for purposes of prosecuting violations under Water Code
subsection 7.176(a)(2). Accordingly, we overrule L.B. Foster’s issue five.
          2.       Sufficiency of the Evidence
          In issues six and seven, L.B. Foster challenges the legal and factual sufficiency
of the evidence to support the used oil conviction. 
          As stated above, when reviewing the legal sufficiency of the evidence, we view
the evidence in the light most favorable to the verdict and determine whether any
rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. King, 29 S.W.3d at 562. In conducting this analysis, we may not
re-weigh the evidence and substitute our judgment for that of the jury. Id. We
measure the sufficiency of the evidence by the hypothetically correct jury charge. 
Malik, 953 S.W.2d at 240.
          In conducting a factual sufficiency review, we ask “whether a neutral review
of all the evidence, both for and against the finding, demonstrates that the proof of
guilt is so obviously weak as to undermine confidence in the jury’s determination, or
the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary
proof.” King, 29 S.W.3d at 563. In reviewing factual sufficiency, the court of
appeals “may not reverse a jury’s decision simply because it disagrees with the result;
the appellate court must defer to jury findings, and may find the evidence factually
insufficient only where necessary to prevent manifest injustice.” Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997). 
          In its briefing, L.B. Foster acknowledges that “substantial photographic,
testimonial, and documentary evidence of oil-contaminated soil” was presented at
trial. L.B. Foster does not dispute this evidence; rather, it contends that the evidence
is legally and factually insufficient to support the used oil conviction because Water
Code subsection 7.176(a)(2) requires the State to present evidence that L.B. Foster
directly disposed of used oil on its land. L.B. Foster points out that both Officer
Hatcher and Officer Dicker testified that they did not observe any individual
dumping, discharging, or pouring oil on the ground at L.B. Foster’s facility. 
          In support of its position, L.B. Foster relies on the language of Water Code
subsection 7.176(a)(2), which provides that a person commits an offense if the person
“knowingly . . . directly disposes of used oil on land.” Tex. Water Code Ann. §
7.176(a)(2) (emphasis added). L.B. Foster argues that the State’s evidence fails to
show a direct disposal of used oil. Rather, L.B. Foster maintains that the State’s
evidence shows an indirect disposal of oil through an intervening agent, e.g., the
disconnected hoses. First, we do not agree with L.B. Foster’s too-literal construction
of subsection 7.176(a)(2). Second, even under L.B. Foster’s interpretation of the
statute, sufficient evidence was presented to support the conviction.
          We apply the plain language of a statute unless that language is ambiguous or
would lead to an absurd result the legislature could not possibly have intended. 
Boykin, 818 S.W.2d at 785; see also State v. Dyer, 200 S.W.2d 813, 815 (Tex. 1947)
(stating a too-literal construction of a statute, which would prevent the enforcement
of it according to its true intent, should be avoided). In analyzing the plain meaning
of a statute, “[w]ords and phrases shall be read in context and construed according to
the rules of grammar and usage.” Dowthitt v. State, 931 S.W.2d 244, 258 (Tex. Crim.
App. 1996) (quoting Tex. Gov’t. Code Ann. § 311.011(a) (Vernon 1998)). 
          Subsection 7.176(a)(2) provides as follows: 
(a) A person commits an offense if the person:
. . . .
(2) knowingly mixes or commingles used oil with solid
waste that is to be disposed of in landfills or directly
disposes of used oil on land or in landfills, . . . .

Tex. Water Code Ann. § 7.176(a)(2). Under its plain language, the subsection
defines two offenses: (1) knowingly disposing of used oil in a landfill that has been
mixed or commingled with solid waste and (2) knowingly disposing of used oil on
land or in a landfill without its first being mixed or commingled with solid waste (i.e.,
directly disposing of used oil on land or in a landfill). Read in context and according
to rules of grammar and usage, the term “directly” signals to the reader that a
distinction exists between the two offenses. From the context of the statutory
provision, it is clear that the distinction is as follows: one offense involves mixing or
commingling used oil with solid waste before disposing of it, while the other offense
does not. 
          If we applied L.B. Foster’s construction of the statute, a defendant who
knowingly disposes of used oil through an “intervening agent” could not be
prosecuted under subsection 7.176(a)(2). We agree with the State that such a
construction would lead to an absurd and unintended result. For example, Officer
Dicker testified about hydrocarbon contamination in the area where hoses had been
“disconnected.” From the evidence presented, it is reasonable to infer that the
hydrocarbon contamination resulted from the disconnection of the hoses. L.B. Foster
offered no evidence to refute or discredit this evidence. Disconnection of a hose
evidences a purposeful act. 
          Under L.B. Foster’s reading of subsection 7.176(a)(2), this conduct would not
be a disposal of used oil because it was accomplished “indirectly” through a hose. 
We do not believe that the Legislature intended such an interpretation. Rather,
uncontroverted evidence indicating that “used oil” contamination resulted from the
disconnection of hoses is legally and factually sufficient evidence to support L.B.
Foster’s conviction for illegal disposal of used oil. We conclude that evidence
supporting a conviction under subsection 7.176(a)(2) will not be deemed insufficient
merely because the State fails to show that the defendant “directly,” i.e., without an
intervening agent, poured or dumped used oil on the ground. 
          Moreover, the State presented evidence showing “direct” (i.e., without
intervening agents) disposals of used oil in this case. The State’s evidence showed
that oil had been changed in a motor vehicle at L.B. Foster’s facility; the used oil had
been placed in a bucket and then dumped “directly” onto the ground. Photographic
evidence showed overturned buckets near L.B. Foster’s fueling station with black,
oily sludge material oozing “directly” onto the ground. Photographic evidence also
showed oily, liquid material sitting in uncovered buckets in one of L.B. Foster’s
buildings. On the floor surrounding the buckets, an oily substance can be seen on the
floor along with absorbent material. Other evidence was presented that, as part of
L.B. Foster’s operations, a hydrocarbon material was poured on the pipes during the
cutting and threading processes, which was then allowed to run from the pipes
“directly” onto the ground or floor. In relation to this issue, L.B. Foster cites to no
evidence in its brief that refutes or discredits this evidence.
          Whether it is viewed in the light most favorable to the prosecution or neutrally, 
we hold the evidence was sufficient to show that L.B. Foster disposed of used oil on
its land.
          We overrule L.B. Foster’s issues six and seven.
          3.       Charge Error
          In issues eight through 11, L.B. Foster complains that the trial court failed to
properly charge the jury with regard to the used oil offense. 
                    a.       Failure to Instruct the Jury on “Directly Disposes”
          As a corollary to its contention presented in issues six and seven, L.B. Foster
complains in issue eight that the trial court erred by omitting the modifying word
“directly” from its abstract and application paragraphs describing the offense. We do
not agree. 
          L.B. Foster requested the trial court to instruct the jury that the charged offense
required the State to prove that L.B. Foster knowingly and directly disposed of used
oil on land. As discussed in connection with issues six and seven, the adverb
“directly” found in subsection 7.176(a)(2) distinguishes the two offenses defined in
that subsection. In this case, L.B. Foster was charged with only one of these offenses:
knowingly disposing of used oil on land. As such, it was unnecessary for the trial
court to instruct the jury utilizing the modifier “directly.” If the trial court had
instructed the jury as requested by L.B. Foster, the term “directly,” taken out of
context, would have been superfluous at best, and misleading at worst. We hold the
trial court did not err in refusing to instruct the jury that the State was required to
prove a “direct” disposal.
          We overrule L.B. Foster’s issue eight.
                    b.       Statute of Limitations
          In issue nine, L.B. Foster contends that the trial court erred in denying its
request to instruct the jury on the defense of limitations. L.B. Foster asserted the
limitations issue by requesting a jury instruction, which the trial court refused. 
          To be entitled to a jury instruction on limitations, the issue must be supported
by the evidence presented at trial. See Howlett v. State, 994 S.W.2d 663, 667 (Tex.
Crim. App. 1999). The State presented the following evidence showing recent “used
oil” contamination in relation to the police officers’ investigation on February 18,
1998: (1) photographic evidence showing that oil contamination was on the
vegetation in the area where the oil from the motor vehicle had been dumped even
though, as testified by Officer Hatcher, there had been a recent rain; (2) Officer
Dicker’s testimony that he observed a “pool of hydrocarbons” standing near the
disconnected hoses; (3) photographic and testimonial evidence indicating that
absorbent material had been placed on the floor of L.B. Foster’s facility to soak up
contamination near the uncovered buckets containing an oily material; and (4)
testimonial evidence from which it could be inferred that, as of the date of the
investigation, L.B. Foster’s employees continued to pour hydrocarbon materials on
pipes during the cutting and threading processes, which then ran onto the ground. 
The felony indictment against L.B. Foster was presented in July 2000, well within the
applicable three-year statute of limitations. 
          We overrule issue nine.
                    c.       Conduct Requirement
          In issue 10, L.B. Foster contends that the trial court erred in failing to properly
instruct the jury on the conduct requirements found in Penal Code subsection 6.01(c),
which provides as follows: “A person who omits to perform an act does not commit
an offense unless a law as defined by Section 1.07 provides that the omission is an
offense or otherwise provides that he has a duty to perform the act.” Tex. Penal
Code § 6.01 (Vernon 2003). Related to this issue, L.B. Foster requested the trial
court to instruct the jury as follows:
A person who omits to perform an act does not commit an offense unless
a law—namely, the constitution or a statute of Texas or the United
States, a written opinion of a court of record, a municipal ordinance, an
order of a county commissioners court, or a rule authorized by and
lawfully adopted under a statute—provides that the omission is an
offense or otherwise provides that he has a duty to perform the act.
The trial court denied L.B. Foster’s requested instruction. L.B. Foster maintains that
without its requested instruction, the State was permitted to argue, and the jury was
permitted to find, that the offense of illegal disposal of used oil could be proven
through “passive disposal,” or through evidence that L.B. Foster failed to remediate
its property. 
          The State’s indictment charged L.B. Foster with the affirmative act of
“unlawfully, knowingly, dispos[ing] of used oil on land.” The indictment did not
charge L.B. Foster with an act by omission. Subsection 7.176(a)(2) does not make
the omission of an act an offense, nor does it place an affirmative duty to act on an
individual. See Tex. Water Code Ann. § 7.176(a)(2). The charge also comported
with the State’s evidence relating to the used oil offense. As discussed in relation
with previous issues, the State presented evidence showing that L.B. Foster disposed
of used oil on its land through affirmative human conduct, such as, by dumping used
motor oil on the ground. 
          The trial court charged the jury as follows: “A person commits an offense if
the person knowingly disposes of used oil on land.” Thus, if the jury followed the
charge, as we presume it did, it could not have found L.B. Foster guilty on the basis
of an omission or a failure to act. L.B. Foster has cited no case, and we find none, in
which a trial court’s failure to give an instruction such as the one requested here was
found to be error. See Cruz v. State, 820 S.W.2d 41, 43 (Tex. App.—Austin 1991,
pet. ref’d) (holding that defendant was not harmed by trial court’s failure to give
subsection 6.01(c) instruction without determining whether failure to give instruction
was erroneous).
          We overrule L.B. Foster’s issue 10.
                    d.       Culpable Mental State
          In issue 11, L.B. Foster contends that the trial court failed to properly instruct
the jury in relation to the “knowingly” culpable mental state specified by the Water
Code subsection 7.176(a)(2). Penal Code section 6.03 delineates three “conduct
elements” that may be involved in an offense: (1) the nature of the conduct; (2) the
result of the conduct; and (3) the circumstances surrounding the conduct. McQueen
v. State, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989); Lugo-Lugo v. State, 650
S.W.2d 72, 74 (Tex. Crim. App. 1983). Here, the charge defined “knowingly” as
follows: 
A person acts knowingly, or with knowledge, with respect to the nature
of his conduct or to circumstances surrounding his conduct when he is
aware of the nature of his conduct or that circumstances exist.
The used oil offense involved here requires two separate, culpable mental states. The
first is that the actor knowingly disposed of used oil. Tex. Water Code Ann. §
7.176(a)(2). The second is that the actor knew the object of the disposal is “used oil.” 
With regard to the conduct elements, to commit the offense of illegal disposal of used
oil, a person must act knowingly with respect to both the nature of his conduct (i.e.,
the disposal) and the circumstances surrounding his conduct (i.e., that what he is
disposing of was used oil). 
          L.B. Foster does not complain of the abstract paragraph defining “knowingly.”
Indeed, the trial court instructed the jury on the proper and applicable definitions of
“knowingly” in this case. Instead, L.B. Foster contends that, as worded, the
application paragraph allowed the State to argue, and the jury to find, that the
“knowingly” element was satisfied with respect to the disposal through evidence that
L.B. Foster knew “circumstances” of oil contamination existed, rather than finding
that L.B. Foster was aware of the nature of its conduct, i.e., the disposal. Without a
specific explanation, L.B. Foster argues that the confusion could have been avoided
by separately defining the constituent elements of the used oil offense for which
“knowingly” had to be proven. 
          In relation to this issue, L.B. Foster’s “Proposed Jury Instruction No. 6.” stated
as follows:
In order to prove the alleged offense of used oil disposal against either
defendant, the State must prove each of the following essential elements
by proof beyond a reasonable doubt:
 
First, that the defendant knowingly and directly disposed of oil on or
after July 24, 1997.
 
Second, that the oil, when defendant disposed of it, was used.
 
Third, that the defendant knew the oil, when defendant disposed of it,
was used. 
 
Fourth, that the exception I read to you previously does not apply to
defendant’s conduct.
 
As to defendant company, L.B. Foster Company, the State must also
prove beyond a reasonable doubt:
 
Fifth, that the commission of the alleged offense was authorized,
requested, commanded, performed, or recklessly tolerated by a high
managerial agent acting in behalf of the corporation and within the
scope of his office or employment.

          The application paragraph submitted to the jury in this case stated as follows:
Now, if you find from the evidence beyond a reasonable doubt that in Harris
County, Texas, on or about the 18th day of February, 1998, the defendant, L.B.
Foster Company, did then and there unlawfully, knowingly dispose of used oil
on land located near 6500 Langfield, you will find the defendant guilty as
charged in the indictment. Unless you so believe from the evidence beyond a
reasonable doubt thereof, you will acquit the defendant and say by your verdict
“Not Guilty.”
          In the application paragraph given by the trial court, the term “knowingly”
directly modifies the phrase “disposes of.” Thus, there was no danger the jury could
have read the application paragraph to allow a finding of guilt based on knowing of
the oil contamination. We conclude that the trial court did not err in failing to submit
L.B. Foster’s proposed application paragraph to the jury.


 
          We overrule L.B. Foster’s issue 11.
CONCLUSION
          Because we sustain L.B. Foster’s legal sufficiency challenge in the hazardous
waste case, trial court cause number 0850911, we reverse the judgment of the trial
court and render a judgment of acquittal. We affirm the judgment of the trial court
in the used oil offense case, trial court cause number 0850910.




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Taft, Keyes, and Higley.
Publish. Tex. R. App. P. 47.2(b).